44 N.J. Super. 468 (1957)
130 A.2d 881
JAMES McBRIDE, PLAINTIFF-APPELLANT,
v.
LLOYD W. McCORKLE, PRINCIPAL KEEPER OF THE NEW JERSEY STATE PRISON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 8, 1957.
Decided April 15, 1957.
*470 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Hamilton F. Kean argued the cause for appellant.
Mr. Eugene T. Urbaniak, Deputy Attorney-General, argued the cause for respondent (Mr. Grover C. Richman, Jr., Attorney-General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff is now serving a life sentence at the New Jersey State Prison as an habitual offender. In October 1956 he filed what was in effect a petition in the Chancery Division praying that an order to show cause be issued directing defendant McCorkle, then Principal Keeper of the State Prison, to explain why he was subjecting plaintiff to cruel and unusual punishment through prolonged "solitary confinement" and denying him free exercise of his religious beliefs through attendance at Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church. Defendant moved to dismiss on the ground *471 that the matter was reviewable only in the Appellate Division under R.R. 4:88-8. The Chancery Division thereupon ordered the proceedings transferred to the Appellate Division "for its consideration" as to whether the matter was reviewable under that rule.
In his initial brief in this court, filed pro se, plaintiff stated that "he is not questioning the reason or reasons as to why he is not released from solitary [sic] confinement nor * * * attacking the rules or regulations of the Board of Managers of the Prison or * * * of the State Board of Control of Institutions and Agencies," but was "only seeking an `order to show cause' why the Principal Keeper of the New Jersey State Prison should not be restrained from invoking cruel and inhuman and unusual punishment upon the plaintiff, because the Principal Keeper has prevented in the past and is now preventing the plaintiff * * * the right to the free exercise of religious beliefs and attendance of Mass on Sundays and Holy days as prescribed by the Roman Catholic Church and nothing else." The Attorney-General, acting on behalf of defendant, then filed an answering brief questioning whether matters relating to the disciplining of an inmate for infraction of prison rules are reviewable under R.R. 4:88-8, but in any event arguing that defendant was not subjected to cruel and unusual punishment or deprived of his religious liberties in violation of the State or Federal Constitution. Attached to this brief was an appendix, certified by the Attorney-General, setting out plaintiff's disciplinary record at the State Prison in detail.
The appendix reveals that plaintiff is not in solitary confinement, as he claims, but has been kept in the segregation wing of the Prison. Although inmates in segregation do not have contact with the general inmate population, they do have contact with each other in the segregation exercise yard and are permitted exercise outdoors for two hours each day, weather permitting. If their conduct warrants, they are permitted commutation credits for good behavior as provided in R.S. 30:4-140, and may take special *472 correspondence school courses through the educational department. They have the same mail privileges as other inmates, and visiting privileges are the same except that visitors must come at stated hours. The case of each inmate in segregation is reviewed once each month by the supervising officer in the custodial department, at which time a decision is made as to whether the inmate may be returned to the general prison population. Inmates in segregation are not allowed to accompany the general prison population to chapel for religious services on Sunday and other appropriate days, but a chaplain of each religious faith is available to such men to visit them in their cells for spiritual guidance, including Holy Communion. Any request made by plaintiff for spiritual assistance would be granted. None of these matters relating to men in segregation is denied. We were informed at oral argument that there are presently some 30 men in the segregation wing of the State Prison.
Following the coming in of plaintiff's reply brief this court, on its own motion, appointed Hamilton S. Kean, Esquire, to brief and argue the appeal on behalf of the prisoner. Counsel was instructed to argue, among such other points as he might desire to raise, whether this appeal properly comes before the Appellate Division under R.R. 4:88-8 and whether the denial to plaintiff of attendance at Mass amounted to what he describes as cruel and unusual punishment. This court desires to express its appreciation to assigned counsel for the thoroughness and excellence of his presentation.
The following facts are not in dispute:
(1) Plaintiff has been in the segregation wing since October 1952. Defendant alleges he was so confined because he participated in the riot in No. 7 Wing at the State Prison on October 12, 1952; plaintiff, however, denies such participation. Plaintiff's disciplinary record shows no acts of misconduct between October 1952 and July 29, 1954, but lists some 15 violations since then which have resulted in a continuation of confinement in segregation. Most of these charges relate to the use of "foul, obscene and indecent language" to prison officials and plaintiff's refusal to obey orders.
*473 (2) While in segregation plaintiff has not been permitted to attend Mass in the prison chapel along with the nonsegregated inmates. The Catholic chaplain will not hold Mass in the segregation wing in the absence of a chapel.
(3) The Catholic chaplain has at all times been available to plaintiff and others in segregation, to offer spiritual advice, guidance and counsel as well as the benefits of the Holy Sacraments.
(4) Plaintiff never complained to or sought a hearing before the Board of Managers of the State Prison as to the matters now complained of, prior to the institution of these proceedings. He has since  as noted below.
Taking advantage of the opportunity afforded under our order assigning counsel, plaintiff's attorney not only attacks as unconstitutional the action of the prison authorities in prohibiting plaintiff from attending Mass on Sundays and other Holy Days, but also their determination that he should be kept in segregation.
We first consider whether the Appellate Division is the proper forum for judicial relief under R.R. 4:88-8, which provides that review of "the final decision or action of any state administrative agency"  other than the Workmen's Compensation Division and the Wage Collection Section of the Wage and Hour Bureau of the Department of Labor and Industry  shall be by appeal to this court.
The State Prison is one of the institutions within the organizational frame of the New Jersey Department of Institutions and Agencies. That Department is headed by the State Board of Control, with the Commissioner of Institutions and Agencies as principal executive officer. N.J.S.A. 30:1-2. The State Board of Control has "complete and exclusive jurisdiction, supreme and final authority, and the requisite power to accomplish its aims and purposes in and upon" the State Prison, among other institutions and agencies. R.S. 30:1-7. R.S. 30:4-1 provides for the appointment by the State Board of Control of a board of managers for each institution or agency within the Department, and R.S. 30:4-4 states that
"Subject to the supervision, control and ultimate authority of the state board, the management, direction and control of the several *474 institutions and noninstitutional agencies shall be vested in the several boards of managers who shall be responsible to the state board for their efficient, economical and scientific operation."
Under the provisions of R.S. 30:4-5, the chief executive officer of each institution or agency shall be its executive and administrative officer and, subject to the rules and regulations adopted by the board of managers, be responsible to that board for "the proper conduct and management of the institution or agency, * * * and the care and treatment of the inmates." Finally, R.S. 30:4-6 provides in part that
"* * * The principal keeper of the state prison * * * shall receive from the hands of the sheriff or other proper officer every person sentenced to imprisonment in his institution and safely keep him therein according to law and the rules and regulations of the institution until lawfully discharged therefrom. * * *"
Plaintiff argues that whether the Principal Keeper is in fact a "state administrative agency" would appear to be immaterial, for under the statutory scheme, outlined above, he operates the State Prison under the direct control of the Board of Managers which, in turn, is under the control of and responsible to the State Board of Control, the chief component of the Department of Institutions and Agencies. Even though he may not technically be a "state administrative agency," his actions, decisions and rules are in fact those of a state administrative agency.
Since the burden of plaintiff's argument is that he has the remedy at law he presently pursues for any wrongs suffered, he consistently urges that the Chancery Division was not the proper forum for him to bring his action initially. This conclusion depends, of course, upon the existence of an adequate remedy elsewhere. An injunction may not be the most appropriate remedy where the execution of a criminal sentence or the violation of personal rights is involved. McClintock, Equity, 426, 428 (1936); Note, "Habeas Corpus, Coram Nobis, Remedies Available to Validly Sentenced Prisoners Who Are Mistreated by State *475 Prison Authorities," 33 Neb. L. Rev. 434, 436 (1954). There is some precedent for the granting of equitable relief upon the threatened deprivation of constitutional rights of a prisoner. Davis v. Berry, 216 F. 413, 418 (D.C.S.D. Iowa 1914). Plaintiff contends, however, that if the relief requested in the instant case can be obtained from proceedings in the nature of certiorari and mandamus, there would appear to be no need for invocation of the extraordinary powers of equity.
Defendant agrees that if plaintiff has any remedy, it must be by review under R.R. 4:88-8, citing McKenna v. N.J. Highway Authority, 19 N.J. 270, 274 ff. (1955), where the court discusses the broad reach of New Jersey's former certiorari practice. However, he contends that this action should proceed against the Board of Managers of the State Prison, rather than against the Principal Keeper, for the latter is only the Board's agent and in carrying out its directives must do so within the limits of the rules and regulations promulgated by it. His action is the ultimate responsibility of the Board of Managers, so that plaintiff properly should have proceeded against it as the "state administrative agency" contemplated by R.R. 4:88-8. Defendant also argues that there is lacking here a final decision or action of a state administrative agency, as required by the cited rule, and that there can be no such decision or action until the prisoner has first made representations to the Board of Managers that he is being subjected to cruel and unusual punishment and being deprived of his religious liberties, with consequent action and determination by that board.
There is no need for further exploration of the question presented by these oppositive views. Directly after being assigned, counsel did make written request of the Board of Managers for a hearing and determination as to whether plaintiff (a) was being subjected to cruel and unusual punishment in violation of his constitutional rights; (b) was being denied the free exercise of his religion; (c) should be allowed to attend Mass in the prison chapel with the *476 other prisoners; and (d) should be released from segregation at this time. The Attorney-General stipulates that the request may be considered as one also addressed to the Principal Keeper, the Disciplinary Court of the State Prison, and the Department of Institutions and Agencies itself, and turned down because, in the considered opinion of those concerned, plaintiff is not being subjected to cruel and unusual punishment, is not being deprived of the free exercise of his religion, cannot be allowed to attend Mass where he may mingle with the inmate population at the regular chapel, and cannot be released from segregation in view of his disciplinary record. We have, then, a final decision or action by a state administrative agency within the meaning of R.R. 4:88-8, and so proceed to discuss the merits.
Does plaintiff's continued confinement in the segregation wing of the State Prison amount to cruel and unusual punishment within the prohibition of the Eighth and Fourteenth Amendments of the United States Constitution or Article I, paragraph 12 of the New Jersey Constitution of 1947? He calls our attention to the fact that he was in segregation from October 1952 to the end of July 1954, although no disciplinary charges were brought against him and he was never afforded the opportunity of a hearing on any charge that may have existed. If there was any cause for complaint, none was made at the time. Nor was any addressed to the prison authorities or to the courts until the institution of the present proceedings, well over two years later. The fact is that since July 29, 1954 plaintiff has on 15 different occasions, while in segregation, been charged with violations, none of them denied, resulting in disciplinary action. His record is one of continued misconduct, exhibiting not the slightest contrition or desire for rehabilitation. Significantly, that record of misconduct came to a sudden stop the moment plaintiff instituted his Chancery Division proceedings. We cannot and will not say that plaintiff's refusal to obey orders and his repeated *477 use of foul and obscene language to prison officials did not merit his continued confinement in the segregation wing.
Although plaintiff initially stated that he was not questioning the reason for his continuation in segregation, or attacking the rules and regulations of the Prison Board of Managers, he now claims that his lot within prison walls is not in strict keeping with these rules and regulations. Courts are not required to supervise the administration of prison rules and regulations and prison disciplinary procedures. To do so would effectively disrupt prison administration and contravene public policy. We do not believe the Legislature or the rules of court intended any such review or result. Such matters are left to the discretion of prison authorities so long as their conduct does not involve deprivation of the prisoner's constitutional rights and is not clearly capricious or arbitrary. The moment a man is sentenced to State Prison and received within its walls, there arises a duty on the part of the Principal Keeper to discipline him according to the practice laid down by the Board of Managers and the State Board of Control. Reasonable discretion must be accorded the Principal Keeper in discharging his duties; penal administration must be kept flexible to the circumstances of a particular case. Whether he is properly enforcing prison rules and regulations is left to the judgment of the Board of Managers, to whom he is responsible in the first instance, and of the State Board of Control ultimately.
Thus, the only situation calling for review would be one where there was presented a statement of facts which, if true, would clearly amount to arbitrary or capricious treatment of the prisoner by the Principal Keeper, or a deprivation of the prisoner's constitutional rights. Present such treatment or deprivation, uncorrected by administrative action or review, there unquestionably would be a judicial remedy. United States ex rel. Foley v. Ragen, 52 F. Supp. 265 (D.C.N.D. Ill. 1943); Coffin v. Reichard, 143 F.2d 443, 155 A.L.R. 143 (6 Cir. 1944); and see Notes, 59 Yale L.J. 800 (1950), 33 Neb. L. Rev. 434 (1954). *478 Such is not the case here. The essential facts are manifested by the recitals and admissions before us and do not require any further showing by formal hearing.
There must be a rule of reason in all prison discipline. Conduct leading to open rebellion or insolence on the part of prisoners cannot be permitted. A prisoner forfeits his free choice of conduct at the moment of his commitment, especially where such conduct is calculated to destroy the order and effectiveness of the institution. In the light of plaintiff's disciplinary record during more than two years last past, his continued confinement in segregation is well within the rule of reason which must obtain in the administration of our penal institutions. It does not amount to cruel and unusual punishment. Cf. Rosenberg v. Carroll, 99 F. Supp. 630 (D.C.S.D.N.Y. 1951); In re Pinaire, 46 F. Supp. 113 (D.C.N.D. Tex. 1942).
We find, further, that the denial of permission for plaintiff to attend Mass on Sundays and Holy Days in the prison chapel, along with the general prison population, does not amount to cruel and unusual punishment or a deprivation of his constitutional rights of the free exercise of his religion. We do not deal here with a case where plaintiff has been singled out from the whole prison population as the only inmate so treated. All men in the segregation wing are treated alike; they are not permitted to attend Mass, but they are all afforded visitation by the chaplains of their respective faiths and, in the cases of Catholic prisoners, the opportunity to receive the Holy Sacraments.
The First Amendment to the United States Constitution guarantees the free exercise of religion, and coupled with the Fourteenth Amendment it also protects citizens from state action prohibiting such exercise. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). And our own State Constitution, Article I, paragraph 3, provides that "No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; * * *." The Supreme Court in the Cantwell *479 case drew a distinction between freedom to believe and freedom to exercise one's belief, pointing out that the former is absolute, the latter not. 310 U.S., at pages 303-304, 60 S.Ct., at page 903. Freedom to practice one's religion must be considered in the light of the general public welfare. Sadlock v. Carlstadt Board of Education, 137 N.J.L. 85, 91 (Sup. Ct. 1948); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). Attendance at Mass is the exercise of religion, and the action taken by the prison authorities in the instant case undeniably curtails it. Examination of decisions upholding curtailment of the free exercise of religion shows that they involved situations where the court found the restriction reasonably necessary to protect some paramount societal interest. Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934); Cantwell v. State of Connecticut, above; and see Antieau, "The Limitation of Religious Liberty," 18 Fordham L. Rev. 221 (1949).
Chief Justice Hughes, speaking for the court in Cox v. State of New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049, 1052 (1941), said that "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." The statement is appropriate here. While the State and Federal Constitutions stand as essential barriers against arbitrary or unjust deprivation of civil liberties, they have not been transgressed in this case. The social interest involved in depriving plaintiff of the opportunity to attend Mass with the rest of the prison population can only be the preservation of order and discipline in the prison. If plaintiff has lost any right, it has come about by his own hand. The interest of an orderly society that required his imprisonment insists only that he be privileged to worship God to the extent that his conduct in prison permits.
*480 Plaintiff argues that defendant has not shown that it is necessary to keep him from Mass to preserve prison discipline. We think he has. Such attendance would obviously impair the disciplinary effect of continuous segregation. It is not for us to review the practiced judgment of the prison authorities, based upon experience, that this would interfere with plaintiff's discipline, and the existing regimen of discipline and order of the remainder of the prison population.
We have noted the availability of the chaplain of the Catholic faith to prisoners in the segregation wing. In the light of plaintiff's claims, the Attorney-General has felt impelled to present the chaplain's affidavit, in which he states that his offers of spiritual advice, guidance and counsel, as well as of the Holy Sacraments, have consistently been refused by the prisoner. We find it difficult to believe plaintiff's denial of these representations. Whatever merit there may be in his claim of frustration of a deeply held religious desire, his spiritual wants will soon be completely provided for. We were informed at oral argument that the request of the Department of Institutions and Agencies for funds to erect a small chapel in the segregation wing  a request first made in 1953  has finally been met. The chapel will be ready for religious services within a few weeks.
The appeal is dismissed.