56 N.J. Super. 245 (1959)
152 A.2d 394
THE BOARD OF EDUCATION OF MOUNTAIN LAKES, ETC., PLAINTIFF-RESPONDENT,
v.
PAULINE MAAS, DEFENDANT-APPELLANT. PAULINE MAAS, INDIVIDUALLY AND AS GUARDIAN AD LITEM, ETC., THIRD-PARTY PLAINTIFF-APPELLANT,
v.
ALTON C. DICKIESON ET AL., THIRD-PARTY DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 1959.
Decided June 22, 1959.
*252 Before Judges GOLDMANN, FREUND and HANEMAN.
Mrs. Esther Strum Frankel argued the cause for appellant (Messrs. Frankel and Frankel, attorneys).
Mr. Aaron Dines argued the cause for respondent Board of Education of Mountain Lakes.
Mr. Louis Winer argued the cause for the third-party defendants-respondents.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant Pauline Maas (who is also third-party plaintiff) appeals from a final judgment and injunction entered in the Chancery Division in favor of plaintiff board of education and the individual third-party defendants, as well as from prior orders granting plaintiff an interlocutory injunction against her and denying her application to dissolve that injunction. The judgment was the culmination of litigation embracing several claims which arose out of defendant's attempts to gain attendance in the Mountain Lakes public schools of three children, temporarily in the United States from the Kingdom of Greece, and who had not been properly immunized against diphtheria.

I.
Mrs. Maas resides in Mountain Lakes and has been a Christian Scientist since December 1933. She is conscientiously opposed to vaccination, immunization, or other forms *253 of medication. In September 1957 she sponsored the admission to the United States of three children from Greece for a 12-month stay here. That stay has since been extended. The children are not Christian Scientists but apparently of the Greek Orthodox persuasion; we are told they come from broken homes where the father has either died or deserted. Prior to leaving Greece they were vaccinated against smallpox in August 1957. They are the third set of three children whom defendant has sponsored. From 1953 to date plaintiff board of education has officially expressed itself on the subject of compulsory vaccination against smallpox and immunization to diphtheria. It has annually, by motion or resolution, consistently taken the view that before a child can be admitted to the public schools of Mountain Lakes there must be proof of vaccination and immunization, and this in the best interests of the public health, safety and welfare. For example, on May 13, 1957 the board on motion reaffirmed its existing policy that all children must be vaccinated against smallpox and present evidence of either a negative Shick test or a course of inoculations with diphtheria toxoid. Defendant appeared at the board meeting of June 3 to object to this policy as a Christian Scientist. On June 17, 1957 the board unanimously adopted the following formal motion:
"The Board of Education of Mountain Lakes shall require vaccination against smallpox and immunization to diphtheria as prerequisites for attendance at school.
Any pupil failing to comply with such requirements shall be excluded from school, unless the pupil shall present a certificate signed by a physician stating that the pupil is unfit to receive the immunizing treatment, or a certificate signed by a physician or by the Board of Health or the health officer of the municipality in which the pupil resides to the effect that the pupil is known by evidence of an appropriate test to be immune to diphtheria; provided, that in either or any such instance the certification and the test employed shall have the approval of the school medical inspector."
A representative group of Christian Scientists appeared at the next board meeting, held July 1, 1957, to present their *254 views, claiming that the existing policy infringed their religious principles and pointing out that there had been no smallpox cases in the borough since 1950. The chairman explained that the board had sought and received both legal and medical advice, and had carefully considered the issue. He invited any board member to move that the policy question be reopened, but no one did so.
Although parents had from time to time sought exemption from immunization on the basis of religious principles, the board adhered to its practice of not granting anyone exemption on that ground.
On September 24, 1957 defendant, as well as her attorney, wrote the superintendent of schools, noting that the children had been vaccinated against smallpox and objecting to immunization to diphtheria as contrary to defendant's religious beliefs and the tenets of the Christian Science Church, and requesting exemption from the board's policy under N.J.S.A. 18:14-64.2, discussed below. Plaintiff, through its attorney, at once responded, enclosing a copy of the resolution setting out the board's policy, pointing out that exemption under N.J.S.A. 18:14-64.2 was discretionary with the board, and stating that the board "does not see fit to change its policy and pupils will be excluded who are not vaccinated and immunized regardless of their religious beliefs." Defendant was further advised that upon compliance with the board rule the three children would be admitted.
On September 30, 1957 defendant, without authority, brought the unimmunized children to the third grade of the local school and told the teacher in charge she was going to leave them there, although they were unregistered. Advised that there were no desks and chairs available, she delivered three stools to the classroom and left the children there for the day. The press and newspaper photographers were present, apparently at defendant's instigation. She continued to bring the children to school daily until plaintiff resorted to the courts.
*255 On October 8, 1957 plaintiff obtained an ex parte order to show cause, returnable three days later, why an interlocutory injunction should not be issued restraining defendant from entering and leaving the three children in the local schools. Defendant filed a detailed affidavit in opposition. Although she alleged she was unable to present a brief because of the short date, her affidavit fully set out her factual and legal assertions. On October 11, 1957 the Chancery Division judge, after hearing oral argument, directed the entry of an interlocutory injunction. Defendant at once discontinued her practice of bringing the children to the school.
Thereafter defendant filed an answer with separate defenses alleging contravention of the religious freedom guaranteed her under the First and Fourteenth Amendments to the United States Constitution and under Article I, paragraphs 3 and 5 of the New Jersey Constitution of 1947; that the policy adopted by plaintiff board was arbitrary and capricious, and in effect repealed the provisions of N.J.S.A. 18:14-64.2; and that plaintiff's refusal to register the children amounted to a denial of the equal protection of the laws. By way of counterclaim she alleged arbitrary and capricious interference with her constitutional right of religious freedom and demanded ordinary and punitive damages.
Defendant's next step was to file a notice of appeal from the Chancery Division restraining order, purportedly as of right. Plaintiff moved to dismiss on the ground that this was an attempt to appeal an interlocutory order, within the ambit of R.R. 2:2-3(a). While this was pending defendant sought direct certification to the Supreme Court. The application was denied. The Appellate Division subsequently dismissed her attempted appeal.
Defendant then filed a third-party complaint against the individual members of the Mountain Lakes Board of Education and the superintendent of schools, alleging willful and malicious interference with her religious beliefs and *256 seeking ordinary and punitive damages. She also claimed damages as guardian ad litem of the three children. After the third-party defendants had answered, Mrs. Maas moved with supporting affidavits to dissolve the interlocutory judgment entered almost a year before. The motion was denied.
The pretrial order is unusually comprehensive and carefully developed. At the hearing which followed plaintiff board introduced minutes of meetings reflecting its official action through the years with respect to immunization and vaccination. It also produced a public health consultant qualified in the fields of epidemiology, bacteriology and biostatistics, who testified that a policy of compulsory immunization to diphtheria promotes the public health and is an effective barrier to the disease. He also stated that the presence of one unimmunized child in a group of immunized children may be the cause of one or more illnesses or deaths from the particular disease because total immunization had not yet been achieved among those who had been treated. Further, it might make the immunized children carriers of the disease. It was his firm opinion that a local board of education policy requiring immunization to diphtheria as a prerequisite to attendance of all children in the schools was a measure in the interest of public health, safety and welfare. Other witnesses for plaintiff were the superintendent of schools, who detailed the history of defendant's attempts to get the children into the school system, and the teacher with whom she had left the children.
Defendant testified in her own behalf, declaring her adherence to Christian Science doctrine and her refusal to have the children immunized because of her religious beliefs. Although invited by the court to present whatever testimony she had on the question of liability under the counterclaim and third-party complaint, defendant rested her case, claiming she had no testimony but insisting that liability existed as a matter of law.
Plaintiff's motion for judgment of injunction on the complaint, and of no cause of action on the counterclaim, was *257 granted. The third-party defendants' motion for judgment of involuntary dismissal was likewise granted. Defendant's motion for an order suspending the operation of the injunction pending the outcome of an intended appeal was denied.

II.
We consider, preliminarily, defendant's claim that she was denied due process by the granting of the interlocutory judgment on three days' notice. She alleges that the short return day made impossible the preparation of a brief, thereby prejudicing her cause.
The Chancery Division judge could have issued a temporary restraining ex parte order under R.R. 4:67-2. Instead, he entered an order to show cause without restraint. The more acceptable practice would have been to bring the matter on by motion. R.R. 4:67-3 provides that unless a temporary restraint or special directions for services are sought, "or other exceptional circumstances appear," an interlocutory injunction shall be applied for on motion without securing an order to show cause. Briefs are required. The trial court must have considered the situation with which the board of education was faced as presenting exceptional circumstances, and so adopted the course indicated.
We perceive no prejudice visited upon defendant, or any denial of procedural due process. Her lengthy counter-affidavit fully set out her contentions, both factual and legal, and her counsel was afforded extensive oral argument. It has been said that due process deals with matters of substance and is not to be trivialized by formal objections that have no substantial bearing on the ultimate rights of the parties. Market Street Ry. Co. v. Railroad Comm'n of California, 324 U.S. 548, 562, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). As Judge Clapp observed in Boots 'N Saddle v. Newark Municipal Bd., A.B.C., 44 N.J. Super. 38, 41 (App. Div. 1957), "The magnificent concept of due process *258 would seem to have acquired a most perverse function if it could be made use of in order to reverse a case where substantial justice has plainly been rendered." Defendant had ample opportunity to be heard, and her contentions were fully aired. Her argument reduces itself to a procedural nicety, and we find it without merit.
Additionally, the matter of the interlocutory injunction is now moot in light of the granting of the final injunction here under appeal.

III.
We would also dispose of defendant's contention that the testimony of the public health consultant should not have been admitted or considered by the court. He was preeminently qualified in his field, and the court properly permitted him to testify. Contrary to defendant's claim, he fully established that vaccination and immunization are effective health measures, reasonably related to and necessary for the public health, safety and welfare. Although defendant strongly attacks the weight that was given his testimony, she offered no countervailing proofs to refute what he said. There was no error here.

IV.
Defendant's main argument is that plaintiff board acted contrary to the statute, N.J.S.A. 18:14-64.2, and restricted religious freedom guaranteed by the Federal and State Constitutions.
Before dealing with the outreaches of this argument we will consider defendant's status to raise the constitutional question.
Defendant is neither the parent nor the legal guardian of the three children whom she brought from Greece. They were given into her temporary custody by their mothers. JAt the time she sought their admittance to the Mountain Lakes public schools she occupied a position no stronger than that of foster mother pro tem  for the period of one *259 year during which the immigration authorities permitted the children to be with her. It is stipulated that the children did not come of Christian Science parents; as we have said, it would appear they had been brought up in the Greek Orthodox Church. They were vaccinated against smallpox before coming to this country, and this apparently without objection on religious grounds. The objection now made to immunization is solely defendant's; it is not asserted on behalf of the children, and could not be in the circumstances.
Basically, the constitutionality of a statute, ordinance or regulation is open to attack only by a person whose rights are adversely affected. The burden of proof is upon the individual who claims himself harmed to show how, as to him, the statute is unconstitutional. Jones v. Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514 (1942). No one can obtain a decision as to the invalidity of a law on the ground that it impairs the rights of others; such a one "is not the champion of any rights except his own." 11 Am. Jur., Constitutional Law, § 111, pp. 752-753 (1937), and see notes 13 and 14. Defendant may not use the children to champion her own rights and beliefs.
Insofar as defendant seeks to assert her own right to religious freedom, she has no standing. The vaccination and immunization requirement does not apply to her. She has no personal responsibility for the children's religious upbringing other than in the religion in which they were raised.

V.
Defendant argues that the policy adopted by plaintiff board was not within the legislative grant of discretion, N.J.S.A. 18:14-64.2, but actually repealed or nullified it. The statute reads:
"The Board of Education of any school district may require immunization to diphtheria as a prerequisite to attendance at school, and it may at its discretion require or waive proof of immunity, except as hereinafter provided.
*260 Any pupil failing to comply with such a requirement may be excluded from school, unless the pupil shall present a certificate signed by a physician stating that the pupil is unfit to receive the immunizing treatment, or a certificate signed by a physician or by the Board of Health or the health officer of the municipality in which the pupil resides to the effect that the pupil is known by evidence of an appropriate test to be immune to diphtheria; provided, that in either or any such instance the certification and the test employed shall have the approval of the school medical inspector.
A Board of Education may exempt the pupil from the provisions of this section if the parent or guardian of said pupil objects thereto in a written statement signed by him upon the ground that the proposed immunization interferes with the free exercise of his religious principles."
In effect, she claims that the last paragraph of the statute compelled plaintiff board to exempt the children from the requirement that they be immunized to diphtheria before they could attend school where, as here, she had objected thereto in writing because it interfered with the free exercise of religious principles. We pass the statutory language which calls for the parent or guardian of the pupil to make such objection  defendant being merely a foster mother  and deal directly with the question of whether the statute is mandatory or permissive. We find nothing mandatory in the provision; it clearly leaves exemption to the discretion of the local board of education.
The use of the word "may" in a statute like N.J.S.A. 18:14-64.2 is not new. For example, the smallpox vaccination statute, R.S. 18:14-52, provided that a local board of education "may" exclude from school any teacher or pupil who had not been successfully vaccinated or revaccinated unless he presented a certificate signed by a medical inspector appointed by the board that he was an unfit subject for vaccination. This law was amended by L. 1952, c. 152, adding language that the board "may" exempt a teacher or pupil from the provisions of the section if the teacher, or the parent or guardian of the pupil, made written objection on the ground that the proposed vaccination interfered with the free exercise of religious principles.
*261 In 1939 the Legislature bestowed similar authority on a local board of education with respect to immunization to diphtheria. N.J.S.A. 18:14-64.2 (L. 1939, c. 299). That statute provided that the board "may" require immunization to diphtheria as a prerequisite to school attendance and "may at its discretion" require or waive proof of immunity. Any pupil failing to comply with the requirement "may" be excluded from school unless he presents a certificate signed by a physician stating that he is unfit to receive immunization, or a certificate signed by a physician or the board of health or the municipal health officer to the effect that the pupil is known to be immune to diphtheria. This statute was also amended in 1952 (c. 153) to read as quoted above, by adding a paragraph relating to exemption where written objection to immunization is made on religious grounds.
The language of N.J.S.A. 18:14:64.2, like that of N.J.S.A. 18:14-52, clearly bespeaks discretion. "May" in the last paragraph is not to be tortured into "shall." If we construe "may" as "shall" in the final paragraph of N.J.S.A. 18:14-64.2, then we would, with equal logic, have so to interpret it in the first paragraph, thereby compelling a board to require immunization, leaving no room whatsoever for discretion. The same illogical result would attend N.J.S.A. 18:14-52, were defendant's reading to be accepted.
The language of the immunization statute is unambiguous, and so there is no need to refer to the legislative statement of purpose which accompanied the 1952 amendment (c. 153). However, we will look to that statement, not to strengthen our conclusion as to the obvious meaning of the law, but to show that defendant's contention is without any merit whatsoever. That statement reads:
"The purpose of this bill is to give a board of education which has exercised its right to exclude certain unimmunized pupils from the public schools, the further discretionary right not to exclude any pupil from the public schools when the pupil, parent or guardian is *262 an adherent of a well recognized religion and when the parent or guardian exercises his religious beliefs in objecting in writing to immunization to diphtheria of his child or ward. This bill will be consonant with the tendency of the Legislature and administrative bodies to uphold religious freedom by virtue of the guarantees afforded by the United States and of this State." (Italics ours.)
Our Legislature has shown its ability to require exemption, when legislative judgment so dictates, in the identical area of statutory enactment. Thus, in N.J.S.A. 18:14-64.10 (L. 1957, c. 133), which provides that a local board of education "may" require all pupils to be immunized against poliomyelitis as a prerequisite to school attendance, and "may" at its discretion require or waive proof of immunity, the Legislature directed that the board "shall" exempt a pupil from the provisions of the act where the parent or guardian makes written objection to immunization on religious grounds. The Legislature there manifested its ability to distinguish "may" from "shall."
It is not our function to interpret the statute here under consideration so that it will read directly contrary to the legislative intent. Any request for statutory modification should be addressed to the Legislature, the appropriate body for such revision, and not to the courts. See Sadlock v. Board of Education of Carlstadt, 137 N.J.L. 85, 89 (Sup. Ct. 1948), quoting from Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905).
Plaintiff's compulsory vaccination and immunization policy was entirely within the ambit of delegated legislative authority, promulgated by N.J.S.A. 18:14-52 and 18:14-64.2. The authority of the Legislature to empower a local agency with such discretion was settled in Jacobson and received judicial recognition by our courts in Sadlock.

VI.
Defendant claims that the board's action was arbitrary and capricious. Not so. Its actions with reference to compulsory health measures have been completely consistent. *263 Its minutes disclose that the subject was considered at length on previous occasions. It consulted legal and medical authority before acting, and has maintained a uniform policy since 1953. The minutes show that no exemption was granted on religious grounds to some and not to others; all parties similarly situated were always treated alike. We are entirely convinced that the board, in its approach to public health measures, comprehensively considered and consistently adhered to a complete prevention method in dealing with school children committed to its care.
It is also contended that the board did not follow the legislative procedure of adopting and continuing its vaccination and immunization policy, thereby denying due process. Further, it is claimed that the board did not even follow its own established procedure, a September 1956 motion of the board providing that all policies be reviewed annually at the first regular board meeting of the year after the organization meeting, and that new policies or revisions to existing policies be adopted by the board only after they had been received in writing and considered in at least one prior regular or special meeting.
The enabling statute, N.J.S.A. 18:14-64.2, does not provide a procedure by which a local board of education must act. Where a statute is silent on the method by which the actions of a municipal body are to be manifested, the delegated power may be exercised by resolution. Cf. Krieger v. Jersey City, 27 N.J. 535, 542 (1958); Eggers v. Kenny, 15 N.J. 107, 123 (1954). The evidence shows that ample consideration was given to the health policy at a number of meetings. The compulsory vaccination and immunization program was often stated and reaffirmed by the board in the years preceding this action. The board restated its position on May 13, 1957 and again on June 17 of that year. Indeed, on February 17, 1958, at the organization meeting of the board, it was agreed that all existing policies be reviewed at the next meeting, and on February 24 the board's policies, rules and regulations were presented for *264 annual review, and no changes, revisions or corrections were made. We find that the board has substantially complied with its own procedure for adopting policies. In any event, its self-imposed by-law calling for annual review of all policies after the organization meeting was simply directory and not jurisdictional. A technical non-compliance with a directory provision will not vitiate the very plainly expressed policy of the board adopted pursuant to statutory authority.

VII.
The core question on this appeal is defendant's contention that the compulsory vaccination and immunization regulation adopted by the board deprived her of due process and religious freedom, within the contemplation of the United States Constitution, Amendments I or XIV, and the New Jersey Constitution (1947), Art. I, pars. 3 and 5.
A requirement that a child must be vaccinated and immunized before it can attend the local public schools violates neither due process nor (as defendant tangentially suggests) the equal protection clause of the Constitution. The rationale for this rule is rooted in traditional concepts recognizing the authority of a local board, acting under a legislative grant of power, to promote the community health, safety and welfare. The fact that there may be differences of opinion as to the necessity or efficacy of vaccination or immunization does not deprive the State of the power to enact legislation requiring compulsory vaccination or immunization, or the local board from acting pursuant to such a power. Jacobson v. Massachusetts, above; Zucht v. King, 260 U.S. 174, 43 S.Ct. 24, 67 L.Ed. 194 (1922); Viemeister v. White, 179 N.Y. 235, 72 N.E. 97, 70 L.R.A. 796 (Ct. App. 1904).
Jacobson involved the validity, under the United States Constitution, of a Massachusetts statute giving a local board of health authority to require vaccination of all residents of the municipality if, in its opinion, it was necessary for *265 the public health or safety. Acting pursuant to that statute the Cambridge board of health adopted a compulsory vaccination regulation. The Supreme Court held that the statute was a proper exercise of the legislative prerogative and that it did not deprive the individual of his constitutional guarantees of personal and religious liberty. Speaking for the court, Justice Harlan said that on settled principles the police power of a state must be held to embrace such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. That there was medical opinion which attached little or no value to vaccination as a means of preventing the spread of smallpox was of no moment; it was for the Legislature, and not the court, to determine the most effective method of protecting the public against disease. Addressing himself to defendant's claim that the statute invaded his constitutional liberties, Justice Harlan said:
"* * * But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that `persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be made, so far as natural persons are concerned.' * * *" (197 U.S., at page 26, 25 S.Ct. at page 361)
Zucht v. King dealt with city ordinances requiring a certificate of vaccination as a prerequisite to attendance at a public school or other place of education. Plaintiff sought an injunction against the enforcement of the ordinances and *266 a writ of mandamus compelling her admission to the public schools, claiming that the ordinances deprived her of her liberty without due process of law. Speaking for the court, Justice Brandeis said it was settled that "a State may, consistently with the Federal Constitution, delegate to a municipality authority to determine under what conditions health regulations shall become operative. * * * A long line of decisions by this Court has also settled that in the exercise of the police power reasonable classification may be freely applied and that regulation is not violative of the equal protection clause merely because it is not all-embracing." The ordinances were held not to confer arbitrary power, "but only that broad discretion required for the protection of the public health." (260 U.S., at pages 176-177, 43 S.Ct. at page 25)
The question of compulsory vaccination was first considered in this State by our former Supreme Court in Sadlock v. Board of Education, above, 137 N.J.L. 85. Prosecutors in certiorari there challenged a certain resolution of the Carlstadt Board of Education making vaccination of school children in the local public schools compulsory. The resolution was adopted pursuant to R.S. 18:14-52, which has heretofore been discussed. The contention was that both the resolution and the statute were unconstitutional in that they violated the guarantees of the Federal and State Constitutions pertaining to personal and religious liberties. The court held that they did not, stating:
"* * * The principle is too well established to require citation that the so-called constitutional liberties are not absolute, but are relative only. They must be considered in the light of the general public welfare. To hold otherwise would be to place the individual above the law. * * *" (137 N.J.L., at page 91)
See, also, the comprehensive annotation in 93 A.L.R. 1413, and particularly at pages 1430 et seq. (1934); Brown, "Police Power  Legislation for Health and Personal Safety," 42 Harv. L. Rev. 866 (1929); cf. Dowell v. Tulsa, 273 P.2d *267 859, 43 A.L.R.2d 445 (Okla. Sup. Ct. 1954), certiorari denied 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955) (ordinance calling for fluoridation of city water supply held valid).
Defendant points out that 18 states have no compulsory vaccination laws and that many New Jersey municipalities do not require vaccination or immunization. This in no way affects the issue before us; the Legislature has chosen to act within the broad field of state police power, and the municipality has adopted a policy pursuant to legislative authority granted. Their right to do so may not be challenged at this late date.
Defendant also argues that compulsory vaccination and immunization is not called for in Mountain Lakes because there has been no case of smallpox or diphtheria for almost a decade. The absence of an existing emergency does not warrant a denial to the regulative agency of the exercise of preventive means. A local board of education need not await an epidemic, or even a single sickness or death, before it decides upon action to protect the public. To hold otherwise would be to destroy prevention as a means of combatting the spread of disease. A similar argument was made in the Sadlock case, and negatively resolved. See Stull v. Reber, 215 Pa. 156, 64 A. 419 (Sup. Ct. 1906), where the fact that there had been no smallpox in the borough for 40 years did not prevent the enforcement of the compulsory vaccination regulation; State v. Drew, 89 N.H. 54, 192 A. 629 (Sup. Ct. 1937).

VIII.
Nor did the local regulation abridge religious freedom within the meaning of the Federal and State Constitutions. In considering the compulsory vaccination of school children under R.S. 18:14-52 adopted by the local board of education in the Sadlock case, the court rejected the *268 precise religious issue here raised by defendant, when it said:
"So, too, with respect to the guaranty of religious liberty, the constitutional guaranty of religious freedom was not intended to prohibit legislation with respect to the general public welfare." (137 N.J.L., at page 91).
In McBride v. McCorkle, 44 N.J. Super. 468 (App. Div. 1957), we had occasion to say:
"The First Amendment to the United States Constitution guarantees the free exercise of religion, and coupled with the Fourteenth Amendment it also protects citizens from state action prohibiting such exercise. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). And our own State Constitution, Article I, paragraph 3, provides that `No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; * * *.' The Supreme Court in the Cantwell case drew a distinction between freedom to believe and freedom to exercise one's belief, pointing out that the former is absolute, the latter not. 310 U.S., at pages 303-304, 60 S.Ct., at page 903. Freedom to practice one's religion must be considered in the light of the general public welfare. Sadlock v. Carlstadt Board of Education, 137 N.J.L. 85, 91 (Sup. Ct. 1948); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). * * * Examination of decisions upholding curtailment of the free exercise of religion shows that they involved situations where the court found the restriction reasonably necessary to protect some paramount societal interest. Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934); Cantwell v. State of Connecticut, above; and see Antieau, `The Limitation of Religious Liberty,' 18 Fordham L. Rev. 221 (1949)." (at pages 478-479)
Prince v. Massachusetts, cited by us in McBride, involved the extent to which the free exercise by members of the Jehovah's Witnesses sect of their spiritual compulsion to sell and distribute on city streets tracts containing an exposition of their faith could constitutionally be impaired by legislative prohibition thereof when carried on by children under specified ages. The problem of conflict between religious faith and regulatory law was essentially the same *269 as that projected by defendant in the present appeal. The United States Supreme Court sustained the law, stating:
"To make accommodation between these freedoms and an exercise of state authority always is delicate. It hardly could be more so than in such a clash as this case presents. On one side is the obviously earnest claim for freedom of conscience and religious practice. With it is allied the parent's claim to authority in her own household and in the rearing of her children. The parent's conflict with the state over control of the child and his training is serious enough when only secular matters are concerned. It becomes the more so when an element of religious conviction enters. Against these sacred private interests, basic in a democracy, stand the interests of society to protect the welfare of children, and the state's assertion of authority to that end, * * *.
* * * It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Pierce v. Society of Sisters, supra [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070]. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.
But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. Reynolds v. United States, 98 U.S. 145 [25 L.Ed. 244]; Davis v. Beason, 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637]. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243 [63 L.R.A. 187]. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." (321 U.S., at pages 165-167, 64 S.Ct. at page 441)
The language of Prince is particularly applicable here, even though defendant does not stand in the position of actual parent or guardian of the three children in question.
*270 Of interest is the legislative attempt in 1954 to amend R.S. 18:14-57 requiring that every pupil attending a public school be examined medically to determine whether any physical defect existed, and that a permanent record be kept from year to year of his growth and development. Assembly Bill 265 attempted to add a proviso that if the parent or guardian of a pupil made written objection to such an examination "upon the ground that the proposed examination interferes with the free exercise of his religious principles," the pupil was to be exempted from the examination. There was a saving clause qualifying the right of exemption where the pupil had been exposed to a communicable disease or his presence in the classroom was certified as detrimental to the health or cleanliness of the other pupils. The measure was adopted by the Legislature at the request of Christian Scientists on the ground that the existing statute compelled medical examination in violation of their religious rights. The bill was vetoed by the Governor, who quoted at length from the Prince case in concluding that the general public health and welfare involved in the existing requirement for physical examination of all school children transcended consequential conflict with religious convictions on the part of those who sought the right of exemption for their children under the bill. See Veto Messages of Governor Robert B. Meyner (1954), page 107 et seq. As to the Legislature's subsequent treatment of R.S. 18:14-57, see L. 1955, c. 25 (N.J.S.A. 18:14-57).
There is some question whether the tenets and teachings of Christian Science actually compel a person like defendant to resist plaintiff board's policy requiring vaccination and immunization for children who want to attend the local schools. We note the following in The First Church of Christ Scientist and Miscellany (1917 ed.), by Mary Baker Eddy, founder of the Christian Science Church:
"I have expressed my opinion publicly as to the precautions against the spread of so-called infectious and contagious diseases in the following words:
*271 `Rather than quarrel over vaccination, I recommend, if the law demand, that an individual submit to this process, that he obey the law, and then appeal to the gospel to save him from bad physical results. Whatever changes come to this century or to any epoch, we may safely submit to the providence of God, to common justice, to the maintenance of individual rights, and to governmental usages. This statement should be so interpreted as to apply, on the basis of Christian Science, to the reporting of a contagious case to the proper authorities when the law so requires. When Jesus was questioned concerning obedience to human law, he replied: "Render to Caesar the things that are Caesar's," even while you render "to God the things that are God's."'
I believe in obeying the laws of the land. I practise and teach this obedience, since justice is the moral signification of law. Injustice denotes the absence of law. * * *" (at pages 219-220)
and
"Then as to the laws  the health laws of the States on the question of infectious and contagious diseases. How does Christian Science stand as to them?
I say, `Render to Caesar the things that are Caesar's.' We cannot force perfection on the world. Were vaccination of any avail, I should tremble for mankind; but, knowing it is not, and that the fear of catching smallpox is more dangerous than any material infection, I say: Where vaccination is compulsory, let your children be vaccinated, and see that your mind is in such a state that by your prayers vaccination will do the children no harm. So long as Christian Scientists obey the laws, I do not suppose their mental reservations will be thought to matter much. But every thought tells, and Christian Science will overthrow false knowledge in the end." (at pages 344-345)
These references to the teachings and writings of Mary Baker Eddy are not intended to be in any way dispositive of the religious freedom issue posed by defendant. We have resolved that question earlier in this section of the opinion on more fundamental, meritorious grounds.

IX.
Defendant has also made the argument that plaintiff's policy on vaccination and immunization would result in a violation of N.J.S.A. 18:14-1 relating to the *272 admission and attendance at school of children between the ages of 5 and 20; N.J.S.A. 18:14-2, which makes exclusion from school of a child between the ages of 4 and 20 on account of race, creed, color, national origin or ancestry a misdemeanor; and N.J.S.A. 18:14-14 requiring every parent, guardian or other person having custody and control of a child between the ages of 7 and 16 to have such child regularly attend the local public schools. With but few exceptions, it has uniformly been held that health measures prescribed by local authorities as a condition of school attendance do not conflict with statutory provisions conferring on children of proper age the privilege of attending school, nor with compulsory education laws. See Annotation, 93 A.L.R. 1413, at pages 1434-1441.

X.
Defendant advances the further point that plaintiff was not entitled to injunctive relief because it had not shown irreparable injury. She admits that if the interlocutory injunction had been vacated she would have resumed bringing the unimmunized children to school in defiance of the board's health regulation. Whether her doing so would have resulted in a spread of diphtheria is not a pertinent consideration. The possibility, however remote, was always present.
We cannot accept defendant's position as sound. Were we to adopt it a board of education would have authority to require vaccination and immunization as preventive health measures, in the public interest, but would be without power to secure the aid of a court in their enforcement.
The injunctive process of the Chancery Division was necessary in aid of the policy of preventing disease, adopted by the local board in the public interest. Prevention, as an effective means, is defeated if court action requires positive epidemic signs as a condition precedent to relief. Defendant's acts were clearly in direct conflict with prevention, with *273 which immunization is so intimately related. The restraint which was sought and obtained preserved the status quo and prevented impairment of the subject matter of the litigation. The public interest was seriously affected.
The pleadings and affidavits made out a clear case for invoking the aid of the court in arresting defendant's behavior pending final determination, and so the interlocutory restraint properly issued. What was true in the initial phases of the case remained true at final determination: the final injunction was clearly justified.

XI.
Finally, defendant complains that the Chancery Division should not have dismissed her counterclaim and third-party complaint. In seeking ordinary and punitive damages under the counterclaim, defendant's theory was that the board had acted in a willful and malicious manner. This was also the basis for her third-party complaint against the individual board members and superintendent of schools.
There was not a scintilla of evidence to support these claims. What the board and the board members did was to adopt a policy clearly within the ambit of discretion provided by N.J.S.A. 18:14-64.2, as we have already held. They acted after due deliberation, consultation and discussion. There was no fraud, malice or discrimination in what they did, and their action was manifestly within the scope of their delegated authority. The record is barren of anything that would indicate the contrary.
The judgment will be affirmed in all respects.