DALE KONVALIN, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

87 N. W. 2d 570

Filed January 24, 1958. No. 34279.

*Joseph M. Lovely* and *Edward T. Hayes,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Cecil S. Brubaker,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The charge against the plaintiff in error, identified herein as accused, was that on or about the 9th day of January 1956, he, in the County of Douglas, forcibly by putting in fear, took personal property of value belonging to Sutherland Lumber Company from the protection of Daniel Hunter, with the intent to rob or steal it. He pleaded not guilty and the trial of the charge resulted in a verdict of guilty. The accused was adjudged to be confined in the Nebraska State Penitentiary. His motion for new trial was denied and he prosecutes this proceeding in error.

The single issue in this court is the sufficiency of the evidence to sustain the verdict and sentence. The accused challenged the sufficiency of the evidence at the close of the case-in-chief of the State and at the termination of all the evidence by motion in each instance for a verdict of not guilty.

The place of business of the Sutherland Lumber Company, hereafter referred to as company, was on the north side of L Street on the west end of the L Street viaduct. The office of the company was about 60 feet north of L Street with its front door and show window facing the street. Adjacent to the office on the east side of the building was a parking area which was open to L Street. The yard area of the company was generally enclosed by a wire fence with openings for two large gates which were equipped so that they could

be locked when they were closed. A vehicle could only enter or leave the yard area by the use of one of the gates. There was a safe in the office which was built in and made a part of the counter therein. The safe was cased in with lumber which gave it and the counter a finished appearance. The outside of the counter was towards the area used by customers and the front of the safe was toward the part of the office in which the routine business and the clerical and record work was done. The safe contained at the time important to this case the records, books, papers, cash in excess of $1,850 of the company, and checks payable to the company in an undetermined amount.

The night watchman of the company, who will be spoken of as Hunter, at about 3:30 a. m., January 9, 1956, was cleaning the counter in the office when the glass in the door was broken. He looked in that direction and saw a man pointing a gun directly at him. The man at the door advised Hunter it was a stick-up and ordered him to lie down near the counter and be still or he would shoot him. Hunter complied. Three men came into the office wearing facial disguises. One of them covered the head of Hunter with his coat and stayed near him with a revolver in his hand. The one who guarded Hunter was probably between 30 and 35 years of age and the other two men were probably not more than 35 to 40 years of age. The last two mentioned attempted to open the safe. Some part of it was broken and Hunter thought he heard it fall to the floor but they did not succeed in opening the safe. They removed the casing from around it. Its weight was about 600 or 700 pounds and it was fitted with wheels or casters. It was taken from its place in the counter to the door of the office. In the meantime the man with the gun had tied the hands of Hunter with a cord taken from a Venetian blind. He was left on the floor of the office. A truck of the company was taken from its

yard. Hunter heard a vehicle start operating soon after the men removed the safe from the office.

The break-in and robbery were reported to the police department of the city. The truck of the company was located at about 5:45 a. m. by a cruiser officer on the ball diamond west of Forty-second and Q Streets. The safe was not in the truck or at that location. The manager of Meeks Rent A Car Company, hereafter referred to as the rental company, rented a Ford panel truck to a man during the forenoon of that day. He represented himself to be and he signed the rental agreement Dale Konvalin. He gave his address as 818½ North Sixteenth Street. That was the address of the fiancee of the accused. He exhibited as his identification a motor vehicle operator's license issued to Dale Konvalin and the number of it was placed upon the rental agreement by the manager of the rental company. The time the rental truck was taken by Dale Konvalin from the rental company's place of business was 10:49 a. m. and was returned at 1:55 p. m. of that day. The man who represented himself to be Dale Konvalin was described by the manager as about 5 feet 9 inches tall, in his early 30's, had a weight of about 185 pounds, was wearing a suede jacket, and had a mustache. There was a man with Dale Konvalin but he was not closely noticed because he took no part in the transaction. He was described as about 30 years old and not as tall as the accused. The two men came to the place of business of the rental company in an automobile which was left in the garage while they had the rented truck. The manager of the rental company endorsed the license number of the automobile on the rental agreement. It was 1-28148. The automobile was about a 1949 or 1950 Pontiac of medium shade. It was the automobile of the fiancee of the accused. The vehicle which the accused rented was a Ford panel truck. After they returned the truck to the place of business of the rental company these men drove away in the

automobile above described. The police were advised of this fact and they immediately commenced a search for the Pontiac car. Myrel C. Meeks, the operator of the rental company, saw Dale Konvalin and the man who was with him when they returned the truck. He observed them at that time for several minutes.

A farmer, who will be referred to as Belak, lived about 2½ miles south of the Omaha city limits and about 1 mile east of Bellevue Boulevard. He also operated what was known as the Gifford farm some distance beyond the farm he owned. There was a road from Bellevue Boulevard to the Gifford farm which ended there. It was a dead-end road. Belak made a trip over this road about 7:30 or 8 o'clock on the morning of January 9, 1956, and he saw or experienced nothing unusual. Later he was going to the Gifford farm from his home after lunchtime that day. He passed a panel truck about one-half block from his home. He was attentive to the truck because there had been break-ins in the Gifford farm and some things had been stolen from it. He noticed the license of the truck. It was 1-527, Nebraska, and he thought it had the figure ½ between the 1 and the 527. He continued down the road about 1 mile and came upon a safe on the edge of the bank with papers and other things near it. He went back and overtook the truck, after following it for some distance, at the intersection of Thirteenth Street coming off of Bellevue Boulevard. It was the identical truck which he had passed on the road from the Gifford farm. He met a policeman, gave him the license number, and pointed out the truck. Belak told the officer what he had seen. He later reported finding the safe to the sheriff of Sarpy County because its location was in that county. He and the deputy sheriff of Sarpy County saw checks at the place where the safe was deposited which were made payable to the Sutherland Lumber Company. The safe was recovered but it had been misused to the extent that it had no value.

The police soon after 2 p. m. that day apprehended the accused at a public telephone booth near a motor vehicle service station at Sixteenth and Clark Streets. The Pontiac automobile described above was parked nearby. They arrested and took the accused to the central police station and there searched him. He had $759 or $756 in currency and about $7 in change on his person. One of the bills they found on him had "24th Woolworth" written with heavy crayon across the front of the representation of the United States Treasury Building thereon.

An employee of the company whose hours were from 4 p. m. to 1 a. m. was performing his duties the night of January 8, 1956, and saw a bill on which there was written "24th" and the name of a street which he thought he remembered was "Woolworth." When he first saw it it was on the ledge of the cash register with the green side of it and the writing thereon in view. He had never seen any other bill written on in this manner and he spoke to the cashier about it. The bill in evidence is in the same condition and looks the same as the one he saw in the office the date stated above. The cashier of the company worked from 4 p. m. until 2 a. m. and he was on duty the night of January 8, 1956, and until 2 a. m. of the following day. He saw the bill above mentioned and it was identical with the one in evidence in this case which was taken from the person of the accused at the time he was searched. The cashier while he was on duty made all change for the company. When he first saw the bill it was on the ledge of the cash register where change was made. He was directed to the writing with what appeared to be black crayon on the back or green side of it. He never saw any other bill marked in that way. The practice of the company was to arrange all bills with the front of them upward. He put the marked bill in the cash register. The bill in evidence does not vary in any way from the one he saw and put in the cash register at that time. He took all the paper bills

out of the cash register at 2 a. m. that morning, tied them in a package, and put them in a metal box in the safe. The safe was locked before he left the office. The bill in evidence with the writing on it is, to the best of his knowledge, the one he put in the safe that night.

The manager of Meeks Rent A Car Company was asked to go to the police station which he did on January 10, 1956. He was there asked to view some men to ascertain if he could identify any of them. He picked out and identified the accused as the man he rented the Ford panel truck to on the forenoon of the 9th day of January 1956. He also identified the accused at the trial of this case. Myrel C. Meeks, the operator of the rental company, saw and observed the accused for several minutes when he returned the truck he had rented on January 9, 1956. Mr. Meeks 2 or 3 days thereafter was at the police station where the officers lined up four men on a platform. They were observed by him and he identified the accused as the man who returned the rented truck to his place of business on the afternoon of January 9, 1956. Mr. Meeks also identified the accused at the time of the trial as the man who returned the truck. A watchman for the stockyards adjacent to the company testified that he saw three men at about 3:42 a. m., January 9, 1956, in the yard area of the company. One was in a truck and the other two stood behind it. He approached them and exchanged remarks with the man who had been in the truck. He alighted from the truck as the watchman approached. They were within 3 feet of each other and had a brief conversation. The watchman identified the man who was in and alighted from the truck as the accused.

A member of the police department of Omaha examined the panel truck which was rented to the accused. The truck was identified for him by the manager of the company which owned it and and the policeman was shown the rental agreement signed by the accused to evidence the identity of the truck. It was

also established that the truck had not been used in the interval between when it was returned to the owner by the accused and the time when it was examined by the policeman. The inside of the body of the truck was not painted. The policeman found chips of paint. The part of them which apparently had been on the outside of the object from which they came was a greenish color. The chips consisted of several layers of paint of various colors. They were found loose on the inside of the body of the truck on its floor. There were metal strips on the floor which it was thought had chipped the paint off of some object which had been in the vehicle. The policeman at the office of the company, in the presence of the man in charge, removed paint from the safe that had been stolen and taken from that office. Parts of the paint had been broken off the safe. The paint the officer removed from it was taken from near the places from which paint had previously been taken and the paint the officer took was removed down to the metal of the safe. It had a rather thick consistency consisting of several coats and the paint was easily removed by the use of a metal instrument. The outside of the paint removed was of a greenish color with coats of paint of red, brown, and other colors underneath. The paint taken from the safe appeared to the officer to be identical with the paint chips he found and took from the panel truck. The two specimens of paint were kept separate and were sent by the police department to the Federal Bureau of Investigation for examination and analysis.

A special agent of the Federal Bureau of Investigation assigned to the laboratory in Washington, D. C., hereafter referred to as agent, qualified and testified as an expert witness. He was a graduate of a college in which he majored in chemistry. He was employed for some period of time as an analytical chemist by the Ideal Manufacturing Company in New Jersey. He was a student for 2 years in a graduate school pursuing the

subject of chemistry. He had been engaged by the Federal Bureau of Investigation laboratory for about 16 years and had made thousands of examinations of glass, paint, metals, and other materials. He had testified concerning the examinations and results of them in many courts, state and federal, throughout the United States.

The agent received two specimens of paint from the police department of Omaha on January 16, 1956. They were separately identified. He turned the paint from the safe on end as one might place a book upon end and examined it under a microscope. In this position he could see the various layers of paint and he found 16. The top or outer coat was a light green. Beneath that the 2nd and to and including the 6th layers were each a light gray-green color. The 7th to and including the 11th layers were each a bright red color. The 12th layer was a thick, coarse aluminum paint. The 13th was a very thin, clear varnish. The 14th to and including the 16th were, respectively, medium gray primer paint, coarse dark gray primer paint, and dark red-brown primer paint which was the last layer of paint and it was next to the metal of the safe. The paint chips from the truck were examined microscopically in the same manner. They were found to have the identical 16 layers of paint. They had the same colors, the same relative thickness, and the same color sequence.

The paint from each sample was then put under the miscroscope at the same time side by side and this comparison showed the same 16 layers of paint were present. They had the same colors, the same color sequence, the same layer structure, and the same texture of paint. Under the microscope with the aid of a solvent such as chloroform a test of the various layers was made and a microchemical test was made of each sample. A microchemical test will disclose what the color agent or pigment is in any paint. A piece of the top layer of light green paint was treated with a small drop of hydrochloric acid and it turned blue. Both samples were treated in the

same manner with the identical result in each instance.

The agent then subjected both samples of paint to a test on the spectrograph, an instrument which discloses the composition of any material such as paint. There are hundreds of known elements and any one of them under proper test will give off light which is characteristic of itself. If a grain of common salt comes in contact with an open flame it will give off a yellowish orange light. The light is characteristic of the substance and this is true in all known elements. A part of each sample of paint was put in a small vessel and burned. The light given off was characteristic of the elements present in the paint. The spectrograph analyses the light given off. The results are recorded on a photographic plate and by examining or studying it the composition of the burned material can be ascertained. The samples of paint submitted were subjected to this character of tests and the two samples of paint were found to have all of the same elements and in the same approximate percentages. The conclusion of the agent was that the paint from the Ford panel truck came from the same surface as the paint from the safe.

The accused became a witness in the case and denied that he in any manner participated in the robbery of the company, that he rented a truck from the Meeks Rent A Car Company, or that he signed the rental agreement. He denied the evidence of the State tending to connect him with the crime charged. He was in many respects corroborated by the testimony of other witnesses. The evidence is conflicting. The verdict of the jury resolved all matters of fact in favor of the State and the evidence and the permissible inferences therefrom must be by this court considered most favorably to the State. There is no claim of error of law in the conduct of the case in the trial court. The issue is only the sufficiency of the evidence to sustain the conviction and sentence. The claim of inadequate proof of the offense charged is not sustained by the record. The

evidence permitted a finding of guilt of the accused of the charge made. The credibility of witnesses and weight of the evidence are for the jury to determine in a criminal case and the verdict of the jury may not be disturbed by this court unless it is clearly wrong. Burnell v. State, 159 Neb. 349, 66 N. W. 2d 838; State v. Warren, 162 Neb. 623, 76 N. W. 2d 728; Pew v. State, 164 Neb. 735, 83 N. W. 2d 377. It may not properly be said that the verdict in this case is clearly wrong. The judgment should be and it is affirmed.

AFFIRMED.