UNITED STATES of America ex rel.
Robert CLEGGETT, Plaintiff,

v.

Frank J. PATE, Warden, Defendant.

No. 63 C 767.

United States District Court
N. D. Illinois, E. D.

May 28, 1964.

Edwin A. Rothschild, Gerald J. Sherman, Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel, for plaintiff.

Daniel N. Kadjan, Asst. Atty. Gen., of Illinois, Chicago, Ill., for defendant.

WILL, District Judge.

Plaintiff Robert Cleggett originally filed this action *pro se* under the Civil Rights Act, 42 U.S.C. § 1983, alleging that the defendant Pate, Warden of the Illinois State Penitentiary at Joliet, had prevented his participation in the academic program offered at the prison and denied him the right to worship at the Episcopal services conducted there. In an amendment to the complaint filed for the plaintiff by court appointed counsel [1] it is further alleged that the plaintiff remains confined to the Segregation Unit as a direct result of the pendency of this

1. Mr. Edwin A. Rothschild and Mr. Gerald Sherman, both of the Illinois Bar and appointed by the Court in this action, rendered able and diligent service as counsel for Mr. Cleggett, for which the Court expresses its gratitude.

suit and that confinement for such reason is a deprivation of access to the Courts in violation of the due process clause of the 14th Amendment.

Cleggett, whose lawful incarceration at Joliet is not at issue here, was removed from the general prison population and placed in the Segregation Unit on March 28, 1963. Prior to that date he had been reported for various infractions of the prison rules, including having forced another inmate to engage in an act of sodomy with him. When initially confronted by the Warden with regard to this last offense, the plaintiff denied any involvement in the incident. The examiner who administered a subsequent polygraph test was of the opinion that Cleggett had not truthfully answered questions relating to his participation in the alleged assault. The prison report of the event states that when the results of this test were made known to him, the plaintiff admitted the attack in question. The report and Cleggett's signed admission are part of the record in this case.

The defendant, in his original response to the plaintiff's complaint, moved to dismiss this action on the authority of Siegel v. Ragen, 180 F.2d 785 (7th Cir.), cert. denied, 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391 (1950), and Kelly v. Dowd, 140 F.2d 81 (7th Cir.), cert. denied 321 U.S. 783, 64 S.Ct. 639, 88 L.Ed. 1075 (1944), cases regularly cited to this Court by the state as holding that internal administration and discipline at state prisons are subject only to state control and regulation and are not within the purview of the federal courts. That motion was denied, but, upon appointing counsel for the plaintiff, the Court limited the case, and the hearing held herein, to the issue relating to the plaintiff's right to attend church services. At the hearing, testimony on the allegations of the amended complaint charging a denial of unhampered access to the Courts was also received.

## ATTENDANCE AT PRISON CLASSES

That portion of the complaint alleging a deprivation of an opportunity to attend prison classes does not raise a constitutional question and therefore is not a proper subject for Civil Rights Act relief. Denial of attendance at the prison school is among the many restrictions and limitations upon activity incidental to lawful incarceration and necessarily within the discretion of prison administrations. See Numer v. Miller, 165 F.2d 986 (9th Cir. 1948). This Court recognizes the need for flexibility and wide latitude in dealing with the myriad situations which confront penal officials. Lawful incarceration necessarily brings about the withdrawal or limitation of many privileges and rights. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). The Warden's exercise of his supervisory authority does not give rise to a cause of action which survives the prison discipline defense unless deprivation of a constitutional right is involved. See this Court's opinion in U. S. ex rel. Hancock v. Pate, 223 F.Supp. 202 (N.D.Ill.1963).

## ATTENDANCE AT CHURCH SERVICES

Eight different religious services are conducted for prisoners in the general population at Joliet. The prison staff includes three full time chaplains; five additional clergymen are associated with the institution on a part-time bases. One of the latter is a minister of the Episcopalian church. All inmates, including those in the Segregation Unit, may confer individually with any of these chaplains about spiritual matters. Such personal ministry has been extended to Cleggett and he has availed himself of it. In his complaint, however, the prisoner seeks the opportunity to practice his religion by participating in corporate worship with his fellow believers. This the Warden has forbidden to Cleggett and all other prisoners similarly confined.

The Warden remains firm that to permit the plaintiff or any prisoner in the Segregation Unit to participate in services held for the general population would create problems of administration and be

of some risk to the other inmates. Warden Pate's testimony at the hearing parallels his answer to the original complaint:

"If the plaintiff, in his present frame of mind, were permitted to attend regular services in the general population, defendant does not think it would be safe for the other inmates who are abiding by the rules and regulations to attend church services with him. Plaintiff is confined to the Segregation Unit because of his institutional misbehavior and his sexual act against another inmate; and, until such a time as plaintiff is released from Segregation Unit to the general population, he cannot expect to receive the same treatment as the inmates who are confined to the general population and who are obeying the rules and regulations." (Defendant's Answer, p. 5.)

The defendant further claims that the determination as to when the prisoner is to be released is totally within his discretion and not subject to the intervention of the federal courts.

Apart from the instant case, this Court does not agree with the Warden's comprehensive interpretation of the internal discipline defense. That doctrine is not without limitation. The Seventh Circuit has held that a suit brought under the Civil Rights Act alleging a warden's failure to cause medical attention to be given to a wounded prisoner states a cause of action against the prison official. Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957). Similarly, the late Judge Clark in Pierce v. La Vallee, 293 F.2d 233 (2d Cir. 1961), enunciated other situations which would warrant federal court intervention:

"Whatever may be the view with regard to ordinary problems of prison discipline, however, we think that a charge of religious persecution falls in quite a different category. * * * [F]reedom of religion and of conscience is one of the fundamental 'preferred' freedoms guaran-

teed by the Constitution. We must approach decision with that admonition in mind." 293 F.2d at 235.

The Pierce court went on to hold that a complaint by a prisoner alleging that he had been deprived of good time and placed in solitary confinement because he held certain religious convictions did not fall to the prison discipline doctrine but rather stated a cause of action which a federal court must entertain.

The special position of religious freedom as a constitutional right excepted from the internal discipline defense is also apparent from the decision in Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961), in which the Fourth Circuit reversed a district court's dismissal of complaints alleging religious discrimination at the United States Reformatory at Lorton, Virginia, an institution maintained for prisoners sentenced by courts of the District of Columbia. Chief Judge Sobeloff, writing for the court, recognized that there is a limit to the prison discipline doctrine: "* * * [I]t has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." 291 F.2d at 198.

Nor are the Second and Fourth Circuits in conflict with the Seventh Circuit's recent decision in Cooper v. Pate, 324 F.2d 165 (7th Cir. 1963). The discipline there allowed was the restriction placed not on a religious group, but on a movement found by the court to have taken on a religious facade better to implement its objective of violent overthrow of the white race.

Answering the broad—and I think erroneous—interpretation of the prison discipline defense raised by the warden, however, does not dispose of the particular situation before me. This is not a case of discrimination against particular religious beliefs. The prisoner is not being punished for having certain religious convictions. Nor is this prisoner being deprived of opportunities permitted others similarly situated. The plaintiff here is seeking to exercise his re-

ligious beliefs by attending corporate worship in the general prison population despite his being assigned to the Segregation Unit.

The distinction between the freedom to believe and the freedom to exercise one's beliefs has been carefully drawn. In Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), Mr. Justice Roberts wrote that the First Amendment, applicable to the states as embodied in the 14th Amendment, "embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of the society." 310 U.S. at 303–304, 60 S.Ct. at 903. Courts have sanctioned the curtailment of the free exercise of religion and imposed limitations deemed necessary to safeguard community interests. Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Cantwell v. Connecticut, supra; Hamilton v. Regents of University of Calif., 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934).

The case which comes closest to the facts before the Court is McBride v. McCorkle, 44 N.J.Super. 468, 130 A.2d 881 (1957). In that action a prisoner assigned to solitary confinement alleged that the Keeper of the New Jersey State Prison was infringing upon his constitutionally protected freedom of religion by denying him the opportunity to attend mass on Sundays and holy days as prescribed by the Roman Catholic church. In a well reasoned opinion Judge Goldmann of the Superior Court of New Jersey held that the freedom to exercise religious beliefs might reasonably be denied to a prisoner so situated:

" * * * While the State and Federal Constitutions stand as essential barriers against arbitrary or unjust deprivation of civil liberties, they have not been transgressed in this case. The social interest involved in depriving plaintiff of the opportunity to attend Mass with the rest of the prison population can only be the preservation of

order and discipline in the prison. If plaintiff has lost any right, it has come about by his own hand. The interest of an orderly society that required his imprisonment insists only that he be privileged to worship God to the extent that his conduct in prison permits." 130 A.2d at 887.

■ Accepting the judgment of Illinois prison officials that to permit prisoners residing in the Segregation Unit to join church services in the general population might endanger the remainder of the prison population, I am constrained to hold that the prisoner has no constitutional right to exercise his religious beliefs by participating in corporate worship while so confined.

## ACCESS TO THE COURTS

■ The plaintiff further alleges that his continued confinement in the Segregation Unit is a direct result of the pendency of this case. If Cleggett is so confined merely for the reason stated, the Warden is denying the prisoner unhampered access to the Courts and, in effect, punishing him for his appeal thereto. Such action is in violation of the prisoner's constitutional rights. Dowd v. U. S. ex rel. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215 (1951); Spires v. Dowd, 271 F.2d 659 (7th Cir. 1959).

As stated above, the plaintiff was placed in segregation on March 28, 1963. He has remained there continuously since that date.

Prior and subsequent to May 2, 1963, the date on which the plaintiff filed the instant action, he and his family have attempted to obtain Cleggett's release from the Segregation Unit. During November, 1963, upon receipt of a letter written to him by Cleggett's mother, Warden Pate granted the plaintiff an interview. The plaintiff testified that at this interview the Warden informed him that he would have to await final disposition of his case in this Court before his release from segregation would be possible.

On February 10, 1964, Yvonne Sanders, the plaintiff's sister, and his brother

Garland Cleggett had an interview with Assistant Warden J. A. Dort. Dort, when asked about their brother's release, allegedly told Mrs. Sanders and Mr. Cleggett that one reason for keeping the prisoner in segregation was his pending suit. Following their talk with Dort, Mrs. Sanders and Garland Cleggett met with the defendant, who allegedly also told them that one of the reasons for the plaintiff's continued confinement in segregation was the action then on file.

Warden Pate, whose duty it is to make the final determination as to a prisoner's term in segregation, denies the above testimony of the plaintiff, Mrs. Sanders and Garland Cleggett. The Warden maintains that he told them that he would not release a man from segregation merely because he had filed a suit and that he would not be pressured into applying anything other than the usual standard —the prisoner's general attitude—as a guide to when Cleggett's release would be appropriate.

The best and most convincing evidence of the prison officials' thinking regarding the possibility of release while a suit is pending is found in a compilation of the prisoner's record at the institution, admitted into evidence as defendant's Exhibit 1. Under the date "11–7–63" there is the following entry: "Letter submitted to Warden F. J. Pate by Ass't. Warden J. A. Dort, as follows:

" 'Today, William Cleggett, 6626 S. Langley, Chicago, and Cornelius Hicks, 1407 E. 63rd Place, Chicago, brother and brother-in-law respectively of our inmate Cleggett #42140, stopped after their visit. The brother wanted to talk about the inmate's present confinement in segregation and to know just what the inmate would have to do to be released from there. I told the brother that first he would have to maintain a perfect institutional record before he would be considered to be released into the general group.

" 'The brother stated that his mother had written to the Warden last week about this situation and that the inmate had told him that the Warden had read the letter to him and the Warden had also advised that he had a lawsuit against the State which would have to be cleared up first.

" 'I informed these visitors that I was present at that time and that the Warden did not read the letter to the inmate in full, but did read certain portions. I told the brother that when the question of inmate's being released from segregation was brought up, the Warden informed him that first he would have to await final disposition of the lawsuit which inmate presently has in the Federal Court.' "

■ On cross examination, Warden Pate stated that the average length of time a prisoner is held in segregation is five to six months. Cleggett has been in the Segregation Unit for over a year notwithstanding the fact that during this time he has not been charged with any infractions of the prison rules.

In light of all the evidence presented, buttressed by the fact that neither the defendant nor his predecessor, Superintendent Ragen, who also testified in this cause, were able to recall any prisoner at Joliet having been released from the Segregation Unit while he had a suit pending in the courts, I have come to the conclusion that Cleggett's continued confinement results solely because of and is a penalty for his initiation of this action and he is thereby deprived of free and unhampered access to the courts as guaranteed to him by the due process clause of the Fourteenth Amendment.

After preparing the foregoing opinion, the Court has just been apprised that the prisoner was released from the Segregation Unit in mid-April. Accordingly the order, which was to accompany this opinion, requiring the defendant Warden to return the plaintiff to the general prison

population, is unnecessary. The Court is constrained nevertheless to enter this opinion as a reminder that inmates of state penal institutions are not shorn of all rights upon incarceration and that the federal courts are open to them in those instances, limited as they may be, where constitutionally guaranteed rights allegedly are being infringed.