Alvin Allen SHARP, Inmate, Nebraska
Penal and Correctional Complex,
Petitioner,

v.

Warden, Maurice H. SIGLER, Nebraska
Penal and Correctional Complex,
Respondent.

Charles E. McCLELLAND, Inmate, Nebraska Penal and Correctional Complex, Petitioner,

v.

Warden, Maurice SIGLER, Nebraska Penal and Correctional Complex,
Respondent.

William Edward YATES, Inmate, Nebraska Penal and Correctional Complex,
Petitioner,

v.

Warden, Maurice SIGLER, Nebraska Penal and Correctional Complex,
Respondent.

Thomas Arthur DAVIS, Inmate, Nebraska Penal and Correctional Complex,
Petitioner,

v.

Warden, Maurice H. SIGLER, Nebraska
Penal and Correctional Complex,
Respondent.

Civ. Nos. 1279L–1282L.

United States District Court
D. Nebraska.

Dec. 11, 1967.

William D. Sutter, Lincoln, Neb., for petitioner Sharp.

Donald F. Burt, Lincoln, Neb., for petitioner McClelland.

Gary G. Thompson, Lincoln, Neb., for petitioner Yates.

Robert L. Anderson, Lincoln, Neb., for petitioner Davis.

Harold Mosher, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for respondent.

## MEMORANDUM

VAN PELT, District Judge.

These separate cases are now before the court for decision following separate trials. There is one question in common to each of the cases. It is whether or not petitioners are being subjected to unlawful discrimination under the freedom of worship clause of the First Amendment to the Constitution by reason of the admitted fact that they are not allowed to attend religious services in the Penitentiary chapel.

Petitioners are each inmates of the Nebraska Penal Complex, each having been sentenced on felony charges. Mr. McClelland is now 39 years of age and has been in the Complex approximately 19 years as a result of two life sentences to be served concurrently on first degree murder charges. While an inmate he was accused of murdering another inmate and was tried and convicted in the District Court of Lancaster County, Nebraska, and again received a life sentence to run consecutive with the prior sentences. Mr. Sharp, who is 22, was convicted in Dodge County, Nebraska, of robbery and has completed the sentence imposed on that charge. While serving the robbery sentence, he was convicted in the District Court of Lancaster County, Nebraska, of an assault and battery based upon his stabbing another inmate. He is now serving that sentence. Mr. Yates, who is 25, was originally sentenced on a charge of felonious assault, robbery and stealing an automobile. In 1963 he was sentenced in the District Court of Lancaster County upon the charge of attempting to escape from the Penitentiary. Mr. Davis, who is 31, was originally sentenced on a burglary charge, which he has now served. He was thereafter convicted in the District Court of Lancaster County, as the result of an attack on another inmate with a knife.

Each of these persons has been confined to the maximum security building in the Penal Complex for periods ranging from several months to a period of over two years in the case of McClelland. Each petitioner has been in the maximum security ward on previous occasions and has been released and then returned upon subsequent violations.

In addition to the known crimes of such gravity as stabbing of an inmate and the killing of another inmate, one of the petitioners is believed by prison authorities to have known of the bringing into the prison of a loaded revolver. However, it was not found on him. It is a fair deduction from the files that each petitioner has at times administered or attempted to administer physical abuse to other prisoners.

The court does not attempt to relate in detail the testimony as to each prisoner. It would serve no useful purpose and might be harmful to the prisoner if the record of complaints against him was set forth in detail in an opinion open to the public. The court has only attempted to set forth enough to show that each prisoner has been convicted of a felony since his original incarceration in the penitentiary and that each is a person who is or has been dangerous to other prisoners or in danger from other prisoners. Each petitioner is a white person. Race is not involved in the complaints. (Exhibits are in evidence reciting the reasons for such confinement and the periods of confinement.)

Each prisoner expresses the desire to attend church on Sunday morning in the prison chapel which is located approximately 100 yards from the maximum security building. Both buildings are within the penitentiary walls. Davis professes to be a Roman Catholic; the other three are Protestants. Both Roman Catholic and Protestant services are held in the chapel each Sunday.

The Warden testified that he did not have sufficient guards available or funds to hire sufficient guards to furnish the necessary guards for each of the persons in maximum security, if each asked to be taken to church services, and expressed fear in some instances for other inmates and in some instances for the petitioner if petitioners were allowed to attend such services.

Each petitioner has a Bible furnished to him by the prison authorities. Each petitioner testified that he had never been interfered with by any of the prison authorities or employees in the reading of the Bible or in prayer and each stated that the prison officials or employees have never prevented him from receiving the sacraments of his church. It does not appear that any petitioner has ever requested the administration of sacraments that was not granted and there is an inference that two or three of the petitioners have never requested the administration of the sacraments.

Radios with head phones are available in each cell. Two channels are available with different programs on each. The programs are determined by attempting to meet the requests of the majority of those in maximum security. There has not been a request for church programs. The Warden indicated a willingness to provide such if there was a request. There was an indication from his testimony that even if one or two requested it he would endeavor to make some radio church service available to the head-phone users.

There was considerable testimony dealing with the use of a conference room in the maximum security ward for church services and the prison chaplain expressed the opinion that a satisfactory service could be held there. It is a fair inference from the Catholic priest's testimony that satisfactory mass could not be held there due to the absence of the necessary accouterments. However, he had administered Communion and received confessions in the conference room. He regarded it as satisfactory for those purposes and for conferences. As to Davis, the priest could recall his attending church once although he said it was possible he might have attended on a few other occasions. It is a fair inference from his testimony that Davis is not one who attends frequently, and is a person whom the priest thought was not interested in attending mass.

The three Protestants have all taken some religious correspondence courses particularly courses sponsored by the Seventh Day Adventist Church. None are members of that church although the step-mother of one is a member.

■ At the outset we are met with the question of whether or not the writ of habeas corpus is an appropriate remedy to raise the First Amendment freedoms. The Court of Appeals for the Fourth Circuit in Roberts v. Pegelow, 313 F.2d 548, considered this and pointed out:

"Unlearned inmates of penal institutions * * * are usually ignorant of the legal niceties of the procedural rules in the courts. If one presents in his own behalf a petition which clearly merits some relief, he ought not to fail entirely because he misconceives the nature of the proceeding or mislabels his petition. If the petition substantively is one for injunctive relief, the court most certainly has a discretionary right to treat it as such, despite the fact that the untutored petitioner has mistakenly designated it as a petition for writ of habeas corpus." (550)

This court is inclined to adopt a similar position. Petitioners are entitled to a hearing upon their claims. In several cases it has been held that relief from similar complaints is available under the Federal Civil Rights Acts. See in re Ferguson, 55 Cal.2d 663, 12 Cal.Rptr. 753, 361 P.2d 417; see also Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 involving the claim of a state prisoner that because of religious beliefs he was denied permission to purchase certain religious books and denied religious privileges enjoyed by other prisoners. The United States Supreme Court held that a claim was stated and that it was error to dismiss the case. Petitioner had relied both upon 42 U.S.C.A. § 1983 and upon 28 U.S.C.A. § 1343 in bringing his action.

The court concludes that it does have jurisdiction to hear these cases.

The question is also raised as to whether or not there was a state remedy available to petitioners. It is clear that

966

they have not attempted to avail themselves of a state remedy. A reading of In re Application of Dunn, 150 Neb. 669, 35 N.W.2d 673, causes this court to believes that petitioners have no remedy in the state courts.

The Second Circuit has held that religious freedom occupies such a "preferred" position in our society that an action could be maintained even though no action had been brought in the state courts. See Pierce v. LaVallee, 2 Cir., 293 F.2d 233. We do not need to take that position here.

It is clear to this court that the petitioners have the right to raise the questions here raised, even though the decision complained of may involve questions of prison discipline. See Sewell v. Pegelow, 291 F.2d 196 (4 Cir. 1961); United States v. Pate, D.C., 229 F.Supp. 818 (1964).

The First Amendment, so far as material here, provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

Authority need no longer be cited that this amendment by reason of the adoption of the Fourteenth Amendment is now applicable to the States.

The claim made here is correctly made only under the free exercise clause. Correctly it is urged that these First Amendment freedoms have a preferred status; yet there are limits even to religious freedom.

The Amendment in effect, provides two freedoms, (1) the freedom to believe, and (2) the freedom to act.

It is said in Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, that "the first is absolute, but * * * the second cannot be. Conduct remains subject to regulation for the protection of society."

The Court also stated:

"It is equally clear that a State may by general and nondiscriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment." (304, 60 S.Ct. 903)

Later, in Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, it was held that a nine year old child could be prevented from distributing religious tracts on the street even though the child believed "it was her religious duty to perform this work and failure would bring condemnation 'to everlasting destruction at Armageddon.'" The child's claim was framed in this language:

"Thus, two claimed liberties are at stake. One is the parent's, to bring up the child in the way he should go, which for appellant means to teach him the tenets and the practices of their faith. The other freedom is the child's, to observe these; and among them is 'to preach the gospel * * * by public distribution' of 'Watchtower' and 'Consolation,' in conformity with the scripture: 'A little child shall lead them.'" (164, 64 S.Ct. 441)

The extent of the claim is shown:

"Shortly, the contention is that the street, for Jehovah's Witnesses and their children, is their church, since their conviction makes it so; and to deny them access to it for religious purposes as was done here has the same effect, as excluding altar boys, youthful choristers, and other children from the edifices in which they practice their religious beliefs and worship. The argument hardly needs more than statement, after what has been said, to refute it. However Jehovah's Witnesses may conceive them, the public highways have not become their religious property merely by their assertion. And there is no denial of equal protection in excluding their children from doing there what no other children may do." (170, 171, 64 S.Ct. 444)

The Court early in the opinion stated:

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. Reynolds v. United States, 98 U.S. 145 [25 L.Ed. 244]; Davis v. Beason, 133 U.S. 333, [10 S.Ct. 299, 33 L.Ed. 637.] And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243 [63 L.R.A. 187.] The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." (166, 167, 64 S. Ct. 442)

The point well established by *Prince* is that religious freedom is not without limits.

In a case involving refusal to grant necessary blood transfusions, the Supreme Court of New Jersey has more recently said:

"But 'neither rights of religion nor rights of parenthood are beyond limitation.' Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645, 652 (1944); Sadlock v. Bd. of Ed. of Borough of Carlstadt, 137 N.J.L. 85, 91, 58 A.2d 218 (S.Ct.1948). See also McBride v. McCorkle, 44 N.J.Super. 468, 130 A.2d 881 (App.Div.1957), where the court pointed out that while freedom to believe is absolute, freedom to exercise one's belief is not and must be considered in light of the general public welfare. The opinion noted that although attendance at Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church is the 'exercise' of religion, a prisoner who, in common with 30 other men in the segregation wing of the State Prison, was prevented from attending Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church, was not thereby subjected to cruel and unusual punishment or deprived of his constitutional right of free exercise of his religion. In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879), the Supreme Court upheld a Mormon's conviction for bigamy against the defense of interference with religious freedom as guaranteed in the First Amendment. Chief Justice White there stated: 'Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?' 98 U.S. at p. 166; 25 L.Ed., at p. 250." State v. Perricone, 37 N.J. 463, 181 A.2d 751, 756, 757.

Circuit Judge Lay, in a very recent opinion, Evans v. Ciccone, 377 F.2d 4, stated:

"Freedom of religion can never mean freedom to interfere with the peaceful rights of others, or freedom to flagrantly disregard reasonable rules of conduct in or out of prison." (6)

Contentions similar to petitioners' were before the District Court of the Northern District of Illinois in 1964. In an opin-

ion by District Judge Will, the court said:

"Eight different religious services are conducted for prisoners in the general population at Joliet. The prison staff includes three full time chaplains; five additional clergymen are associated with the institution on a part-time basis. One of the latter is a minister of the Episcopalian church. All inmates, including those in the Segregation Unit, may confer individually with any of these chaplains about spiritual matters. Such personal ministry has been extended to Cleggett and he has availed himself of it. In his complaint, however, the prisoner seeks the opportunity to practice his religion by participating in corporate worship with his fellow believers. This the Warden has forbidden to Cleggett and all other prisoners similarly confined." United States v. Pate, D.C., 229 F.Supp. 818, 819 (1964).

After discussion of *Cantwell*, supra, and other cases, Judge Will concluded "that the prisoner has no constitutional right to exercise his religious beliefs by participating in corporate worship while so confined." (821)

It should be emphasized as it was in United States v. Pate, supra, that petitioners are not being punished for having religious convictions.

Two prisoners similarly in maximum security are being permitted to attend chapel services. One is Alvarez, under death sentence, whose case has been argued and submitted to the Nebraska Supreme Court. The Warden testified that as to men under death sentence it has been the custom to allow them to attend chapel services. The other, Harlan Lynn Noble, (See Noble v. Sigler, 8 Cir., 351 F.2d 673 for the nature of his offense) is not regarded by the Warden as dangerous to other prisoners but is confined for his own safety. The court concludes that petitioners are not being treated differently than others similarly situated, when all the circumstances are considered.

It seems to the court that the present cases are closely parallel to the situation of shut-ins as used in church terminology. There are many people outside the prisons who are unable to attend church on Sunday by reason of physical defects and handicaps. It is not unusual for such people to be ministered to in their homes. Pastoral calls are made, prayers are said, the Bible is read, and religious discussions ensue. It is certain that "shut-ins" do worship and that their spiritual needs are satisfied even though they do not worship in public.

In the instant situation we have persons all or some of whom in certain quarters would be regarded as dangerous. The administrative officers of the Penal Complex are keeping them under maximum security.

■■ This court as early as Shupe v. Sigler, Civ. 470L (1961) stated that it would not interfere with the internal discipline of the prison. It has frequently since that time reannounced that position. The court believes that to order respondent to take any of the petitioners though the yard frequented by other prisoners for a distance of approximately 100 yards, into the chapel, under armed guard and in some instances handcuffed or otherwise under restraint, would be imposing its judgment in an area in which the courts should not enter. These are matters that properly are to be decided by the Warden. So long as he does not act arbitrarily and thereby deprive a prisoner of his constitutional rights, this court should neither restrain nor criticise his action. The court is convinced in these four cases that the Warden has not acted arbitrarily; that he has good reason for the restraint placed upon each of the petitioners.

■ Although it is to be inferred that the Warden would order church services held each Sunday in the maximum security building if this court thought it necessary in order to provide petitioners with their First Amendment freedoms, the court concludes that it will not so order or even indicate the desirability of such a service. This again is a matter within

the discretion of the Warden and in the absence of arbitrary action on his part no such directions need be given.

The court concludes that the petitioners are within their rights in bringing these actions but that their complaint is ill-founded. They have all the rights guaranteed to them under the First Amendment to the Constitution. Neither the Warden nor the subordinate officers or employees at the Penal Complex have interfered with their exercise of those rights.

They are being restrained for cause. Any man who is confined to prison is under some restraint. The degree of restraint, except in unusual circumstances which are not shown in this case, is for the determination of the prison authorities. No cruel or inhuman punishment has been meted out. The withholding of the right to attend religious services in the chapel, under the facts of these cases, cannot be construed as such.

This memorandum will stand as the court's findings of fact and conclusions of law in each case. Separate orders dismissing the petitions will be entered in each case.