408 F.2d 966
 Alvin Allen SHARP, Appellant,
v.
Maurice H. SIGLER, Warden, Appellee.
Charles E. McCLELLAND, Appellant,
v.
Maurice H. SIGLER, Warden, Appellee.
William E. YATES, Appellant,
v.
Maurice H. SIGLER, Warden, Appellee.
Thomas Arthur DAVIS, Appellant,
v.
Maurice H. SIGLER, Warden, Appellee.
 No. 19179.
 No. 19180.
 No. 19200.
 No. 19201.
 United States Court of Appeals Eighth Circuit.
 March 24, 1969.
 
 Donald F. Burt, Lincoln, Neb., for Charles E. McClelland.
 Gary G. Thompson, Lincoln, Neb., for William Edward Yates.
 Robert L. Anderson, Lincoln, Neb., for Thomas Arthur Davis.
 Clarence A. H. Meyer, Atty. Gen. of Nebraska, Lincoln, Neb., Harold Mosher, Asst. Atty. Gen., Lincoln, Neb., for appellee.
 Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 The four plaintiff-appellants, each of whom is a convicted felon and an inmate of the Maximum Security Unit of the Nebraska Penal Complex, by these actions seek the pronouncement of their right to participate in corporate worship with the general population of the prison. They assert that they have been denied the free exercise of their religion guaranteed by the First Amendment.
 
 
 2
 The four prepared separate handwritten petitions. These were filed the same day. Each is entitled "Petition for Court Order Upholding Constitutional Rights". The petitions, while differing somewhat, are similar. Each alleges that the petitioner is held in maximum security; that the defendant warden has denied him the right to attend the religious services which are held in the prison chapel; that the chapel "is located deep within the confines of an adequately staffed maximum security penitentiary";[1] that the petitioner believes in a divine power; and that he is denied his constitutional rights. Each recites that the warden holds the petitioner in segregation not "as a form of punishment" but only as a security measure.
 
 
 3
 Judge Van Pelt appointed counsel for each petitioner and held four separate hearings on two consecutive days. The court filed one memorandum containing his findings and conclusions for all four cases. It declined to grant the relief sought and it did not order that additional services be held in the Maximum Security Unit. Sharp v. Sigler, 277 F. Supp. 963 (D.Neb.1967). It then issued certificates of probable cause under 28 U.S.C. § 2253. The appeals are in forma pauperis.
 
 
 4
 All four petitioners are white. No issue of race, as such, is present.
 
 
 5
 We mention each petitioner's prison history:
 
 
 6
 Sharp: This petitioner, now about 23, was convicted of armed robbery in the District Court of Douglas County, Nebraska, in 1963. A sentence of 5 years was imposed. On June 8, 1966, in the District Court of Lancaster County, Nebraska, Sharp was convicted, upon his plea of nolo contendere, of assault and battery on an officer of the penitentiary. For this offense he received a sentence of 2 years to be served consecutively to the robbery sentence. The robbery sentence has now been served and Sharp remains incarcerated under the assault sentence.
 
 
 7
 McClelland: This petitioner, now about 40, on December 22, 1948, in the District Court of Douglas County, Nebraska, pleaded guilty to murder in the second degree. He received a life sentence. On the same day in the same court he received a second life sentence on another murder charge. The two sentences were to be served concurrently. On June 6, 1966, McClelland pleaded guilty, in the District Court of Lancaster County, Nebraska, to a charge of first degree murder of a fellow inmate. For this offense he received a third life sentence to be served consecutively to the other two.
 
 
 8
 Yates: This petitioner, now about 26, on May 29, 1962, in the District Court of Cheyenne County, Nebraska, pleaded guilty to charges of felonious assault, robbery, and automobile theft. He received a sentence of 12 years on each of the first two charges, to be served consecutively, and a 7-year sentence on the third charge to be served concurrently with the others. On March 15, 1963, Yates pleaded guilty, in the District Court of Lancaster County, Nebraska, to a charge of attempt to escape from the penitentiary. For this offense he received a sentence of 18 months to be served consecutively to the sentences he was then serving. The 1962 sentences were vacated on procedural grounds by the Cheyenne County court on November 2, 1966. On the same day Yates entered new pleas of guilty to the three 1962 charges. He received sentences of 12 years, 12 years, and 7 years respectively, these sentences to run concurrently and with credit for the time served under the sentences which were vacated.
 
 
 9
 Davis: This petitioner, now about 32, was convicted of burglary and sentenced. Later, on March 29, 1963, while he was an inmate, he pleaded guilty in the District Court of Lancaster County, Nebraska, to a charge of assault with intent to kill, wound, or maim a fellow inmate. For this offense he received a sentence of 4 years to be served consecutively to the burglary sentence. The burglary sentence has now been served and Davis remains incarcerated under the assault sentence.
 
 
 10
 We thus have in Sharp a felon convicted first of armed robbery and then of an assault upon a prison officer; in McClelland, a three-time murderer with his last victim a fellow inmate; in Yates a felon convicted of assault, robbery, and automobile theft and then of attempt to escape; and in Davis a felon convicted of burglary and then of an assault upon a fellow inmate. Each of the four, while incarcerated, has managed to commit and be convicted of attempt to escape or of an assaultive felony.
 
 
 11
 At the time of the hearings in the District Court Sharp had been in the Maximum Security Unit since October 10, 1966, McClelland since November 28, 1965, Yates since March 21, 1967, and Davis since January 6, 1967. Each had been there on previous occasions.
 
 
 12
 The records contain evidence of the difficulties the respective petitioners have encountered during their incarceration in addition to the formal charges and convictions hereinabove outlined. We share Judge Van Pelt's diffidence, expressed in 277 F.Supp. at 964, as to describing these in detail in a published opinion although the taking of the appeals certainly opens the way to our doing so. We are content to recite the following:
 
 
 13
 As to Sharp: He has violated numerous prison regulations; has participated in an attack upon a guard; has been found with a knife in his possession; and has been in maximum security on five previous occasions. He has been in no trouble since he was placed in maximum on October 10, 1966.
 
 
 14
 As to McClelland: He has attempted to escape; has had pills and hypodermic needles and other devices in his possession; and has destroyed prison property. He has been in no difficulty during the 13 months preceding the hearing in district court.
 
 
 15
 As to Yates: He has violated numerous regulations; has threatened a guard; has fought with other inmates; has attempted more than once to escape; has been defiant and abusive; and, with others, has failed a polygraph test relating to a loaded pistol found in the prison. He has been in maximum security on four previous occasions.
 
 
 16
 As to Davis: He has violated numerous regulations; has been involved questionably with other prisoners; and has been found with a knife and other contraband in his possession on more than one occasion.
 
 
 17
 The Maximum Security Unit is a separate building within the Penal Complex. The prison chapel is in another structure in the center of the prison confines. It is about 100 yards from the Maximum Security Unit. It has an organ and an altar. Both Catholic and Protestant services are held in the chapel each Sunday. The chapel, however, is also used for other purposes.
 
 
 18
 Sharp, McClelland and Yates profess to be Protestant. Davis professes to be Roman Catholic. Each has a Bible furnished by the institution. None has been interfered with in the reading of the Bible or in prayer and none has been denied the administration of sacraments. None has made a request for a church program on the radio facility in the cells. Sharp, McClelland and Yates have taken Bible correspondence courses in prison.
 
 
 19
 On the other hand, none of the four has been allowed to attend regular services in the prison chapel while they have been confined in the Maximum Security Unit. Sharp and McClelland each demanded this privilege by formal written interview request on August 20, 1967. These were returned by the warden with the notation, "Why?". Yates testified that he, too, had submitted a written request to attend chapel. Davis testified to the same effect.
 
 
 20
 As the district court pointed out in its memorandum, there was testimony concerning the possible use of a conference room, about 16 × 18 feet in size, in the Maximum Security Unit for religious services. The defendant warden testified that, if the chaplains approved, he would be willing to have a small altar built for use in that room, to have a piano moved there, and to permit the maximum security inmates to worship there. There would never be more than 18 eligible to do this. He testified further that he would let the chaplains decide how many of these inmates could attend at one time; that "they may go to church, one or all, if we have to have church all day"; that, if four went together, a lieutenant and a guard would be needed; that, if any of the four petitioners were to be allowed to attend services in the prison chapel, it would be necessary to use handcuffs and have at least one guard for each man; and that he does not have funds available to provide a separate guard for each prisoner. Sharp testified that if an altar and an organ could be provided in the conference room, it was possible that this would change his feeling as to whether he could worship there. McClelland expressed objections to having services in that room. The Protestant chaplain testified that the conference room could be made satisfactory for services and that he could achieve an "atmosphere of worship" there. The Catholic chaplain testified that in his more than 7 years at the Complex this "is the first time that anybody has asked me to do any more than to take care of the essential sacraments"; that he wondered, if the conference room were prepared for a Catholic service, whether "it would be used anyway"; and that his "own feeling is, that the essential things have been taken care of."
 
 
 21
 Each petitioner advances certain reasons why he feels he is entitled to the prison chapel privileges:
 
 
 22
 Sharp says that he is held in maximum security for investigation "of an alleged stabbing" in October 1966; that no charge has been filed in respect to that incident; that he has been in no trouble since then; that he is not asking to be returned to the prison population but is "only asking to make one trip per week to the prison chapel to worship his God in a proper religious setting"; that refusal of this request is an unreasonable restraint; and that the security risk would be greater if several were allowed to gather in a small room than if they were permitted to walk the 100 yards to the chapel.
 
 
 23
 McClelland asserts that his "past record indicates that he needs spiritual guidance"; that, in contrast to Black Muslims, his religion is not disruptive and espouses no philosophy of hate or racism; and that, in fact, he has been escorted without incident across the prison yard to have his picture taken and his teeth fixed.
 
 
 24
 Yates claims he is being denied his freedom to worship because of his misconduct in ways not related to religion.
 
 
 25
 Davis states that he has left the Security Unit, handcuffed to an officer, to attend sick call, to confer with the warden, and to receive dental care "on several occasions" and has caused no trouble; that his religion is not one which teaches race hatred and insurrection; that he is a Catholic and merely asks to attend Mass regularly with the rest of the population; and that, if necessary, he would be willing to go to the chapel in handcuffs.
 
 
 26
 We are satisfied as to federal court jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4). Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Jackson v. Bishop, 404 F.2d 571, 573 (8 Cir. 1968).
 
 
 27
 It is settled, too, that the First Amendment's guarantee of the free exercise of religion is now applicable to the states, whatever may be the reasoning route by which that result is attained. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); School Dist. of Abington Tp, Pa. v. Schempp, 374 U.S. 203, 215, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
 
 
 28
 The First Amendment's proscription of any law "respecting an establishment of religion, or prohibiting the free exercise thereof" is a cherished right. Indeed, freedom of religion has been characterized as possessing "a preferred position". Murdock v. Com. of Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Marsh v. Alabama, 326 U.S. 501, 509, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Pierce v. La Vallee, 293 F.2d 233, 235 (2 Cir. 1961). See Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Pres. Ch., 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).
 
 
 29
 But it continuously has been recognized that there are certain limitations to religious freedom. While freedom to believe is absolute, the exercise of religion is not. The exercise is not, for example, to be "injurious to the equal rights of others". Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890). "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." Reynolds v. United States, 98 U.S. 145, 166, 25 L.Ed. 244 (1879). "And neither rights of religion nor rights of parenthood are beyond limitation." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Mr. Justice Roberts succinctly expressed the governing principles in Cantwell v. Connecticut, supra, 310 U. S. at 303-304, 60 S.Ct. at 903:
 
 
 30
 "Thus the Amendment embraces two concepts, — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. * * * In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."
 
 
 31
 See Holdridge v. United States, 282 F.2d 302, 311 (8 Cir. 1960).
 
 
 32
 These precepts do not stop short in their application at a prison's doors. Fundamental rights follow the prisoner through the walls which incarcerate him but always with appropriate limitations. In Evans v. Ciccone, 377 F.2d 4, 6 (8 Cir. 1967) this court noted specifically, "Freedom of religion is recognized as within the proper exercise of a federal constitutional right for prisoners." However, in the same opinion, Judge Lay, in speaking for the court, observed that that petitioner's assumption that "practice of his newly acquired faith permits violation of prison discipline * * is basically incorrect. * * * Freedom of religion can never mean freedom to interfere with the peaceful rights of others, or freedom to flagrantly disregard reasonable rules of conduct in or out of prison." 377 F.2d at 6. See Sostre v. McGinnis, 334 F.2d 906, 908 (2 Cir. 1964), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96.
 
 
 33
 Our case of Jackson v. Bishop, supra, 404 F.2d 571 (8 Cir. 1968) primarily concerned Eighth Amendment rights. We there noted, however, 404 F.2d at 576-77 and 580, in general terms and with rather extensive citations, that lawful incarceration "may properly operate to deprive the convict of certain rights which would otherwise be his to enjoy"; that a state prisoner "does not lose all his civil rights during and because of his incarceration"; that federal courts "entertain a natural reluctance to interfere with a prison's internal discipline", whether the institution be federal or state; that, however, "the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and where indicated, to grant relief"; and that "constitutional requirements are not, in this day, to be measured or limited by dollar considerations * * *." Indeed, in that case we directed the entry of further injunctive relief with respect to certain practices in a state's penal institutions.
 
 
 34
 We think that the measure and comparison of security risks as between alternative procedures are matters appropriate for resolution by the prison authorities and are not to be determined by the inmate. Further, these four petitioners, each with a history of violent crime, both within the prison and in freedom, and each with a record of consistent defiance and of violation of rules promulgated for the preservation of order and for the protection of the rights and safety of all inmates, including themselves, are in a woefully weak position piously to proclaim their rights or desire for corporate worship with the general prison population. All four do claim to be Christians. Presumably, the admonition of Matthew 6:5-7 from the Sermon on the Mount has some application and validity for each of them.
 
 
 35
 The standard is one of reasonableness. This record demonstrates for us that under all the circumstances the defendant warden's actions were not unreasonable. He has endeavored reasonably to provide for the asserted religious needs of these petitioners. And he has offered to make provision for services in the conference room to the extent that the institution's chaplains feel it acceptable or necessary. We see nothing arbitrary, in the constitutional sense, in the defendant's actions and proposals.
 
 
 36
 There is a suggestion in McClelland's brief that the Reverend Mr. Shaw of Lincoln, Nebraska, a clergyman not connected with the penitentiary, was denied access to McClelland. We have carefully reviewed the record in that petitioner's case and, in particular, the testimony of the Protestant chaplain, of Mr. Shaw, and of the petitioner. We perceive no inappropriate denial of access to the clergyman. McClelland had never seen Mr. Shaw before. Two ladies of the clergyman's congregation had suggested that McClelland be seen. A conference was scheduled but was deferred by the chaplain who felt that McClelland's instability at the time made the visit inadvisable. No permanent barrier to consultation was erected. Mr. Shaw did not pursue the matter; he testified that one of the reasons he attempted no further contact was that he had been busy.[2]
 
 
 37
 On May 15, 1968, and thus several months after the hearing in the district court, McClelland submitted to the chaplain his written "Request for Religious Services" in the conference room of the Maximum Security Unit on the following Sunday, May 19, with "all the essentials of proper religious worship of the Protestant faith * * * music, singing of hymns, confession of faith, reading of Scriptures, and a regular sermon." The petitioner submitted a copy of that written request as a part of his reply brief on appeal. The record, of course, does not reveal what, if anything, was done in response to that post-hearing request for a specified Sunday just 4 days later and there is nothing for us to pass upon. The defendant warden in his testimony clearly indicated, as we have hereinabove noted, that, at the chaplain's request, he would make arrangements for services in the conference room. We do not assume that he has reneged as to this assurance.
 
 
 38
 The fact that Davis professes to be a Roman Catholic perhaps requires a separate comment. While he was an inmate of the penitentiary, but not within the Maximum Security Unit, he requested the administration of sacraments on three or four occasions. These requests were complied with until, the Catholic chaplain testified, Davis "was no longer interested." He refused Confirmation in 1965. During his present confinement in the Unit he has not requested anything of the chaplain.
 
 
 39
 The petitioners finally argue that the records reveal discrimination in religious exercise in the prison and that this is prohibited. State ex rel. Tate v. Cubbage, 210 A.2d 555 (Del.Super.1965). They point out that permission to attend chapel services was granted to inmate Alvarez, described as "a convicted rapemurderer", to inmate Noble (see Noble v. Sigler, 351 F.2d 673 (8 Cir. 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed. 2d 81), and to inmate Konvalin (see Konvalin v. State, 165 Neb. 842, 87 N.W.2d 570 (1958), cert. denied, 358 U.S. 846, 79 S.Ct. 71, 3 L.Ed.2d 80), all of whom also were in the Maximum Security Unit, and it is urged that this permission to these three convincingly demonstrates impermissible discrimination. Sharp says that he "surely can not be classified as as great a security risk as a convicted rapemurderer".
 
 
 40
 Admittedly, the three named inmates were allowed to go to the chapel while the four petitioners were not. Admittedly, also, all seven were maximum security inmates. But their common lodgment does not render impermissible appropriate and justified differences in treatment. The records contain testimony from Warden Sigler that Alvarez was under sentence of death and therefore "must be kept in the segregation unit"; that the only disciplinary incident on Alvarez' record was his refusal one time to come in from the exercise yard; that Noble "has maintained an almost perfect conduct record"; and that Konvalin was a man who "has never been guilty of any acts of violence within the institution to my knowledge".
 
 
 41
 The distinction among the seven, therefore, is one based upon their respective behavior records. We hold that the granting of permission to Alvarez and Noble and Konvalin, who presented no real disciplinary problems, and the withholding of permission to Sharp, McClelland, Yates and Davis, who consistently have caused unrest and posed threats to the safety and even the lives of fellow inmates, is a distinction which was reasonably, properly, and intelligently made and which was constitutionally valid. Failure to make that distinction might well have occasioned criticism of the warden as to his judgment and the fulfillment of his duty.
 
 
 42
 We do not underestimate an inmate's need for spiritual guidance and the importance of such guidance in rehabilitation. But these petitioners expect and ask too much. Let them demonstrate by their continuing conduct that they are entitled to what they respectively seek. They will be entitled to enjoy what they earn. But until these four, with their miserable deportment records, both of the distant past and of the immediate past, improve their conduct, they are in no position to demand, or to receive by this court's interposition, what they claim in the name of the free exercise of religion. McBride v. McCorkle, 44 N.J. Super. 468, 130 A.2d 881, 886-887, 130 A.2d 881 (1957); United States ex rel. Cleggett v. Pate, 229 F.Supp. 818, 819-821 (N.D.Ill.1964); Cooper v. Pate, 382 F.2d 518, 522-523, 524 (7 Cir. 1967). See Wright v. McMann, 387 F.2d 519, 526-527, n. 17 (2 Cir. 1967), and Desmond v. Blackwell, 235 F.Supp. 246 (M.D.Pa. 1964). We recognize that in both McBride and Cleggett the courts observed that all persons in maximum security there were treated alike. 130 A.2d at 886; 229 F.Supp. at 820. Neither opinion, however, was based only on "equal treatment." Preservation of order and protection of the rights of others were controlling factors. So it is here.
 
 
 43
 The district court's denial of relief in each case is affirmed.
 
 
 
 Notes:
 
 
 [1]
 McClelland's petition does not contain this particular allegation
 
 
 [2]
 The respondent in his brief asserts that since the hearing in the district court Mr. Shaw has asked to visit McClelland and has been permitted to do so