**UNITED STATES of America ex rel. James E. NELSON, Plaintiff,**

v.

**John J. TWOMEY, Warden, Illinois State Penitentiary, Defendant.**

**Holice P. BLACK et al., Plaintiffs,**

v.

**John J. TWOMEY, Warden, Illinois State Penitentiary, Defendant.**

**Rudolph L. LUCIEN, Plaintiff,**

v.

**Peter B. BENSINGER and John J. Twomey, Defendants.**

**Nos. 72 C 1685, 72 C 1686 and 72 C 1706.**

United States District Court, N. D. Illinois, E. D.

Feb. 28, 1973.

James E. Nelson, pro se.

Hollice P. Black, pro se.

Jack R. Thomas, pro se.

John L. Ligue, pro se.

Richard Black, pro se.

Rudolph L. Lucien, pro se.

William Scott, Atty. Gen., Jayne A. Carr, Asst. Atty. Gen., Chicago, Ill., for defendants.

### MEMORANDUM OPINION and JUDGMENT ORDER

AUSTIN, District Judge.

These three consolidated pro se cases have been brought by prisoners of the Illinois State Penitentiary at Joliet seeking monetary and injunctive relief for damages resulting from the response of prison officials to an incident in which several guards were beaten and an attempt was made to incite a riot among the inmate population. The defendant prison officials have moved to dismiss this complaint or, alternatively, for summary judgment. Having considered the affidavits of both sides, this court finds that there is no genuine issue of material fact and for the reasons stated below grants summary judgment in favor of all defendants.

Basically, plaintiffs allege violations of their civil rights because Warden John J. Twomey placed the entire inmate population on an institutional lock-up ("deadlock") after an attack upon several guards that occurred on July 2, 1972. Deadlock is authorized by § 809 of the Administrative Regulations of the Department of Corrections of the State of Illinois and it entails the confinement of all or some of the prisoners to their cells on a twenty-four hour basis until the Warden decides that it is safe to return the institution to its normal routine. In this case the deadlock lasted nine days.

██ Plaintiffs complain that the deadlock punished the entire prison population for the actions of only a few inmates and further that this restriction violated their due process rights because it was imposed without a hearing. However, the very nature of the present confinement system makes it self-evident that such measures do not violate the standards of due process and equal protection when taken in response to a real threat to prison security and when limited to a reasonable period of time to allow for the cooling of inflamed passions on both sides. Indeed, the authorities would be lax in the execution of their duties were they not to do all in their power to restore discipline and thereby protect the physical security of those involved. Similar issues were before another judge of this court in United States ex rel. Miller v. Twomey, 333 F.Supp. 1352 (N.D.Ill.1971), and he ruled that the imposition of a deadlock under these circumstances lay within the sound discretion of the prison authorities. He further stated, "Where an imminent and real threat to security in the prison exists this discretion is all the more broad and flexible." 333 F.Supp. at 1353.

 I fully agree with that point of view and find sufficient uncontested facts to justify my decision not to second guess the penological judgment of the defendants in this case. The incident began when inmate Williams became belligerent towards one officer and struck another in the face. After help was summoned another prisoner attacked the guards with a baseball bat

while other inmates either looked on * or went throughout the institution attempting to incite a general riot. Warden Twomey and other administrative personnel were able to quell the disturbance without the use of force, although they encountered "sustained passive resistance" in their attempts to do so. Affidavit of John J. Twomey, dated September 7, 1972, at page 2. After consulting with the Director and Assistant Director of Corrections, in accordance with § 809 of the Administrative Regulations cited earlier, Warden Twomey ordered the deadlock pending an investigation of the disturbance. Nine days later, on July 11, 1972, the deadlock was rescinded for all those not involved in the disturbance, among whom were the plaintiffs herein. Under these circumstances I find it impossible to conclude that the deadlock constituted an abuse of discretion or that regulation § 809 is a denial of due process.

█ Next, plaintiffs allege that during the deadlock some inmates were released to perform their usual duties, while others, including themselves, were kept on restricted status. For their part, defendants reply that it was essential to release some inmates in order to provide certain vital services in areas such as the kitchen, laundry, and hospital. Seeking to create a factual conflict on this point, plaintiffs have submitted numerous affidavits stating that many inmates were released although their services were not vital. However, even if that were true, it does not violate plaintiffs' civil rights because the decision to release or restrict under these circumstances lies within the Warden's discretion. Indeed, regulation § 809

permits the Warden to "confine one, several, or all inmates of the institution pending investigation." Plaintiffs allege no other facts from which the court can infer that their restricted confinement was arbitrary, unreasonable, capricious, or vindictive. On the other hand, Warden Twomey restricted the activities of the prison population in order to protect life and property within the institution. There is nothing irregular or unconstitutional about his decision to release certain inmates who did not present a threat to the interests he sought to protect.

█ Next, plaintiffs assert that they were denied the right to attend classes during the deadlock and that this constitutes a violation of their civil rights. Aside from the quite obvious fact that a legitimate deadlock necessarily and legally curtails all of the group activities of the penitentiary, this argument overlooks the point that attendance at a prison school is not in itself a constitutionally protected interest absent some evidence tending to show that the authorities acted unreasonably in withholding or suspending such a program. United States ex rel. Cleggett v. Pate, 229 F. Supp. 818 (N.D.Ill.1964). That is clearly not the case here.

█ Plaintiffs also complain that the sanitary and medical conditions during the instutitional lockup violated the standards of decency of the Eighth Amendment. Similar complaints were raised by the petitioner in United States ex rel. Miller v. Twomey, *supra,* and the court properly disposed of them on the basis of Adams v. Pate, 445 F.2d 105 (7th Cir. 1971) and other cases. The al-

---

* There is a difference of opinion between plaintiff Lucien and the defendants on the question of how many other inmates were in the area of the incident. Defendants say that fifty or sixty inmates blocked the exit to the cellhouse. Lucien's complaint asserts that two hundred inmates watched the incident but did not become involved in any manner. This conflict does not present a genuine issue

of material fact because it is undisputed that at least two inmates attacked prison officers and that other inmates sought to incite a riot. Hence, there being no issue of *material* fact, under these circumstances the court finds it reasonable to defer to the authorities' judgment as to what constitutes a threat to prison security, notwithstanding inmate Lucien's personal estimate of the situation.

legations in this action are no worse than those made in both Adams v. Pate, *supra,* and United States ex rel. Miller v. Twomey, *supra.* Although such conditions are unfortunate, they simply do not rise to the level of a constitutional violation.

██ Finally, it is asserted that there was no "sick call" during the institutional lockup. Whether there was in fact a formal sick call or whether the authorities chose another method of referring inmates for treatment, hospital records indicate that 253 prisoners were treated at the medical facility during the lockup. Affidavit of Dr. Julius Venckus, dated September 20, 1972, Exhibit L to defendant's brief. Those same records indicate that 812 prisoners were treated during the period of July 12 through July 21 and that 730 prisoners were treated during the period of July 22 through July 31. Hence, it cannot be denied that during the deadlock the inmates' access to medical treatment was significantly curtailed. However, even those cases cited by some of the plaintiffs themselves recognize that their right to medical treatment is restricted by the bounds of reasonableness, *e. g.,* Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966), which would surely permit the authorities to curtail normal access to medical facilities in the face of the emergency herein. Moreover, the refusal or failure to provide medical care does not itself rise to the level of a constitutional deprivation absent allegations of bodily injury whose severity is significantly greater than that claimed by these plaintiffs. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Tolbert v. Eyman, 434 F.2d 625 (9th Cir. 1970). Plaintiff Lucien's complaint about "wheals" and food allergies has been adequately answered by the affidavit of Dr. Venckus, dated August 23, 1972 and in any event fails to state a cause of action under 42 U.S.C. § 1983 because it relates merely to the adequacy of the attention he has already received, a question which is generally

beyond the competence of a district court. Cates v. Ciccone, 422 F.2d 926 (8th Cir. 1970).

Cases dismissed.